[No. F060234. Fifth Dist. July 13, 2011.]

In re MICKEL O. et al., Persons Coming Under the Juvenile Court Law.
BRENDAN O., Plaintiff and Appellant. v.
MERCED COUNTY HUMAN SERVICES AGENCY, Defendant and
Respondent.

## COUNSEL

Brendan O., in pro. per., for Plaintiff and Appellant.

James N. Fincher, County Counsel, and James B. Tarhalla, Deputy County Counsel, for Defendant and Respondent.

## OPINION

**KANE, J.**—Brendan O. (maternal grandfather), maternal grandfather of Mickel O. and Mallory P. (collectively, the children), appeals the juvenile court's denial of his petition, filed pursuant to Welfare and Institutions Code section 388, requesting that the court place the children with the maternal grandparents (maternal grandparents) or, in the alternative, provide maternal grandparents unsupervised visitation with the children. In addition, maternal grandfather specifically contends (1) the social worker violated his constitutional rights by searching his personal belongings; (2) the social worker did not comply with the juvenile court's mediation order; (3) the agency[1] and the juvenile court failed to investigate referrals made regarding abuse and neglect of the children while in the paternal grandparents' (paternal grandparents) care; (4) the social worker did not properly investigate allegations of mistreatment of Mallory; (5) the juvenile court failed to protect Mallory and failed to enforce the Child Abuse and Neglect Reporting Act (Pen. Code, § 11164 et seq.); (6) the social worker's report was biased and contained false information; (7) maternal grandparents should have been considered for adoptive placement; (8) the juvenile court erred when it granted de facto parent status to the paternal grandmother (paternal grandmother); (9) the children were denied effective assistance of counsel; and (10) the juvenile court failed to consider the best interests of the children.

While we sympathize with maternal grandfather's desire to have an active role in raising the children and recognize that these proceedings have been unduly protracted and difficult, we cannot say the juvenile court abused its discretion in denying the Welfare and Institutions Code section 388 petition. However, we do conclude the court abused its discretion in terminating

---

[1] The Merced County Human Services Agency.

supervised visitation for maternal grandparents. Accordingly, we will reverse the order terminating supervised visitation and remand to the juvenile court with directions.

## PROCEDURAL AND FACTUAL BACKGROUND

This case has a long history, much of which has been recounted in other opinions. At this point, the two sets of grandparents are fighting over the children. We set out a brief history.

The mother (mother) and the father (father) had two children, Mickel and Mallory. The children lived with mother and maternal grandparents until Mickel was four years old and Mallory was eight months old. During this time, Mickel formed a strong bond with maternal grandfather. On August 22, 2006, the children were made dependents of the court (Welf. & Inst. Code, § 300)[2] based on allegations that mother and father failed to protect or supervise the children and that mother suffered from mental illness, developmental disability or substance abuse. The children were placed with father. The agency offered mother reunification services.

On October 24, 2006, the agency filed a supplemental petition alleging that mother attacked father and paternal grandmother in father's home, and that father failed to prevent mother from having contact with the children. The children were removed from father's home and placed with a paternal aunt. On November 9, 2006, the petition was sustained and maternal grandparents were granted de facto parent status.

On June 19, 2007, reunification services to mother were denied, and reunification services were ordered for father.

Due to a medical situation in the paternal aunt's family, the children needed to be moved. On August 7, 2007, maternal grandparents sought placement. The homes of both sets of grandparents were considered for placement, but mother was residing in maternal grandparents' home. The agency was concerned that maternal grandparents could not protect the children from mother. The court placed the children with paternal grandparents. Maternal grandparents appealed the placement order and we affirmed (*In re Mickel O.* (June 26, 2008, F054035) [nonpub. opn.]).

On January 18, 2008, maternal grandparents filed a petition under section 388 to change a court order.

On April 15, 2008, paternal grandparents were granted de facto parent status. Mother's motion to reinstate reunification services was denied, she appealed, and we affirmed (*In re M.O.* (Feb. 27, 2009, F055603) [nonpub. opn.]).

---

[2] All statutory references are to the Welfare and Institutions Code unless otherwise noted.

On May 22, 2008, the parties agreed to participate in a bonding study.

On August 21, 2008, Pattee Russell-Curry (the expert) submitted the bonding study report to the social worker, Sandra Contreras (the social worker). As noted in the report, the social worker had requested that the expert determine which adults the children considered as parents, and explore the bonding between the children and their parents and grandparents. The expert first interviewed and observed the parties in her office, but found that the adults were tense and unnatural in the setting, so she decided to observe them at home where they would behave more naturally. Her report contained the following observations:

## "Characteristic Patterns of Interaction

"The children exhibit very clear patterns of close personal space with their family and with me, as a stranger. They responded to nurturing touch, playful touch, and gentle physical redirection. I used these techniques with them, and observed all of the [maternal family] to also use this style. The children were more positively responsive, with [Mickel] controllable by [maternal grandfather] when he quietly guided him in this way. [Mickel] was less responsive with this type of redirection from the . . . women [on the maternal side]. In fact, [Mickel] seemed to, in general, be far more oppositional defiant with all the females[ of both families.] Mallory, was generally resistant with every one, although she was most responsive to [paternal grandfather's] guidance. She became increasingly oppositional with [paternal grandmother's] physical restraint, and was sassy, silly or 'impish' with everyone in a challenging or defiant way.

"Both children presented with distinct and rapidly changing mood swings. Mallory was frequently whiny, pouty and defiant and most of the photos of her at visits were very unhappy looking. Over time, I observed Mallory to be a happy child, but it was often mixed with being naughty when she had the biggest smiles and laughter. This 'style' of playing seems mixed with hidden anger.

"[Mickel] presented as a mild and pleasant child, who could quickly and violently strike out at his sister, and shocked me on his first session, and was quickly redirected by me. Over time, I saw [Mickel] as a very sad, depressed child, who has moments of happiness. His sadness seems to be complicated by missing his [father], being unsure of his mother's love, wanting to go home to [maternal grandfather], ravenous for [maternal grandmother's] cooking, desperately wanting a close physical bond with [paternal grandfather] (who has more distant physical boundaries), and seeing sport in defying and confounding [paternal grandmother], when what he really wants is for her to play with him.

"I found [maternal grandparents] overall to be more warm, nurturing and physically close and accommodating to these children. They naturally shaped their bodies and moved their faces into intimate, close personal space as they attempted to engage the children. Mallory consistently used less eye contact, and overall was more avoidant with [maternal grandparents] than with [paternal grandparents]. [Mickel] was very engaged with [maternal grandfather] at the exclusion of all others.

"[Paternal grandparents] are more physically reserved. I observed more distal gestures of affection. For instance, where [maternal grandparents] might curve their bodies around the child's, or encase them and envelope them as they worked at the table with toys, [paternal grandparents] were more likely to move the children over, establish distinct spa[t]ial boundaries, reach out and touch them at a distance, use words of affection, but without the body engaging in reinforcing the meaning of their words. [Paternal grandmother] has very clear boundaries, and the children often attempted to move into her physical space for nurturance and intimacy, but she would define these attempts as inappropriate. However, I did not see any inappropriateness in their attempts to be close to her. They did occasionally need help regulating how they negotiate intimacy in another person's space.

"I believe that the distinctness of these differences may in large part be due to cultural styles and differences. However, these children have internalized love and intimacy with close physical proximity, shaping the body into the other person's space. [Paternal grandparents'] discomfort with this style has led to anxiety on their part, concerns and misunderstanding, I believe, and has created frustration for these children.

"In terms of 'goodness of fit', the children do not fit well with [paternal grandparents'] style of relating. They are clearly at home in their style of relating with [maternal grandparents]. The 'goodness of fit' is evident in the ways in which they relate with [maternal grandparents]. [¶] . . . [¶]

### "Nature and Extent of Bond of [Mickel] with [Paternal Grandfather]

"[Mickel] seems to really like [paternal grandfather]. He attempts to have much physical contact with him . . . . [Paternal grandfather] previously explained to me that he was not raised with so much physical contact with his own father, and so it feels somewhat uncomfortable for him. . . . After observing everyone, I believe that [Mickel] wants, very much, to establish a warm nurturing relationship with [paternal grandfather] as a Father/Grandfather figure. I believe this is because he appears to have a warm, nurturing, physical relationship with [maternal grandfather]. This is how he has learned to show familial love, but it is somewhat frustrated by the difference in styles of relating between the two families.

"In the home observation, I found [paternal grandfather] to be far less mellow and laid back than he presented in my office. In his home, he tended to get caught-up in some power struggles with [Mickel]. He ignored Mallory's naughty words, but perhaps she was testing for him to set limits. . . . It was evident[,] however, that [paternal grandfather] is at a disadvantage being gone four days out of the week. On his return, he has to continually reestablish boundaries with the children, I suspect. . . . Currently, the children deal exclusively with [paternal grandmother] during the week, then must adjust to [paternal grandfather's] expectations which[,] are different, upon his return.

## "Clinical Impressions of [Mickel] and [Maternal Grandfather]

"[Mickel] appears to be most closely attached and bonded to [maternal grandfather]. This relationship is almost exclusive to all others. He is attentive with eye contact, much interaction, and warm love and affection between them. When seen together with the rest of the [maternal] family, [Mickel] remains almost exclusively with [maternal grandfather]. His mother attempted several times to get his attention for a big hug or to interact, and he would harshly admonish her that he was busy playing.

"While I do understand the special and intense bond that a child can develop with a grandparent, it is noteworthy that this intensity between them seems to actually exclude everyone else. This seems to me, to be not healthy in its exclusion of others, not necessarily because of its specialness or intensity, but because of how it alienates the rest of the family. I would think that this would make them feel left out. It certainly cheats [Mickel] out of learning how to engage in meaningful interaction with others in a more engaged way.

"[Maternal grandfather], of all the adults, seemed to have the best luck with [Mickel] in speaking softly to him, cueing him to settle down with a gentle touch on the back or arm, to nurture him with affectionate pats on the head.

"Additionally, the intense focus on [Mickel] almost exclusively, although not completely, was noteworthy. I do understand that a much more developed relationship was built with [Mickel] than with Mallory simply because of how young she was when she was removed from the home. Yet, I would expect grandparents to more democratically divvy up their time with the children, and to want to get to build the relationship with Mallory since they may feel cheated out of so much precious time with her.

"Instead, what I saw, which seems to be consistent with observations of others, is that there is a gender division within the family. [Maternal grandfather] and [Mickel] have their activities and focus, and [maternal grandmother] and [mother] focus primarily on Mallory. Both [maternal grandmother] and [mother] do make attempts to engage [Mickel], but he ignores, pulls away, rebuffs or otherwise rejects them in the presence of [maternal grandfather]. I did not observe [maternal grandfather] help [Mickel] learn how to bridge those social skills by encouraging him to look at them and respond when spoken to, or to invite them to join them in an activity so they were not left out. There seemed to be an unspoken understanding among them that this is how they function. I believe that this unusual division of interaction and relational pattern is a significant piece of why [maternal grandparents] were not considered more seriously for placement. It appears that these issues were addressed on several occasions with [maternal grandparents], but that they either did not understand their significance, or were unwilling to take corrective feedback that might have assisted them in working toward the return of the children to them.

## "Clinical Impressions of [Mickel] and [Maternal Grandmother]

"[Maternal grandmother] stands by happy to see [Mickel], but takes a back seat to the group activity, primarily. When seen alone with [her], [Mickel] avoided a lot of eye contact, played parallel to her and, in general, only tolerated her, in comparison to his need for mother's approval, and his clear engagement with [maternal grandfather]. [Maternal grandmother's] role appeared to be one of nurturer through food. She appears to be a wonderful cook, who regularly sent tasty food for the children to eat, which they hungrily gobbled down. . . . [¶] [Maternal grandmother] made many attempts at appropriate play with [Mickel] and he was responsive sometimes, such as in playing hide and seek, which developmentally and emotionally, given his many disruptions, losses, and home changes, was a great game for them to play.

## "Nature and Extent of Bond of [Mickel] and [Paternal Grandmother]

"[Mickel] demonstrates clinical oppositional defiant behavior with [paternal grandmother]. He is really challenging, testing limits, saying the opposite of what is expected, teasing and being defiant without mercy. In some instances, I felt that he was trying to engage [maternal grandmother] in play with him, but because he was being rude, disrespectful, disobedient, out of control or otherwise out of line, it was not really possible for [her] to engage with him in that way. On the other hand, because [she] is perhaps a more serious person with him than the other adults, he may be responding to this difference in style with the only social skills he has, which are to be playful,

rambunctious or strong willed and defiant. In this way, their personalities are mismatched. [¶] Nonetheless, while he was able to separate from all other adults, . . . he showed great anxiety when [paternal grandmother] left the room, and would not let her go without him. He refused to be left. Although he gave [her] a very hard time in their session with me, he had trouble separating from her when [paternal grandfather] came to take him home and [paternal grandmother] remained a few more minutes with me. I found that he had an ambivalent attachment with [paternal grandmother], one that is needy and insecure, but wanting very much to feel secure. Although he gave her the most trouble, he also appeared to rely on her the most in other ways emotionally, as she is his caretaker now. [¶] . . . [¶]

## "Recommended Steps for Developing Healthy Attachments

"In this family's situation, I believe that there are no normal, natural, healthy bonds, but there are many attachments that are ambivalent, enmeshed, avoidant, or insecure.[3] In my opinion, [Mickel] is intensely bonded, in an enmeshed sort of way with [maternal grandfather], so that it keeps him from developing a more balanced bond with the females [on the maternal side of the] family. I believe there are distinct attitudinal differences between the sexes in the [maternal grandparents'] home, and there are certainly cultural and special needs issues which must be kept in mind when understanding how their family functions. It may be that [maternal grandfather] was the buffer for [Mickel], from the instability in his mother's life. His intense bond with [maternal grandfather] may be the result of the 'abuse bond' with his mother. [¶] [Maternal grandfather's] willingness to help [Mickel] 'bridge' his attention to include his mother and grandmother, or sister, would assist in reducing the intense enmeshment between them, and open up more relational opportunities between the male and female relatives. This ability would help socialize [Mickel] and Mallory in ways to include people, make them feel welcomed, loved and accepted. [¶] . . . [¶]

## "Discussion of the Nature and Extent of Bonds in the Family [¶] . . . [¶]

"[Mickel] had a happy, if somewhat hyperactive visit [at maternal grandparents' home], primarily exclusive with [maternal grandfather]. When I told him it was time to go, and that [maternal grandfather] would keep his toys safe (rather than taking them), he reached for [maternal grandfather] who picked him up. In that moment, [Mickel] emotionally and physically collapsed in [maternal grandfather's] arms as dead weight, said he didn't want to leave, and cried large crocodile tears to the end of the visit. I immediately

---

[3] The expert later defined "enmeshed" as follows: "I think that it means there is an overinvestment or an overinvolvement that may, again, hinder the child's ability to do things independently and develop mastery."

followed up at the [paternal grandparents'] home as he was returned and he was calm and happy. I saw no signs of lasting trauma. However, I believe that his authentic emotion of despair, and his attachment to [maternal grandfather] are primary, fundamental and intense. That he does not have a more intensely bonded connection with his mother . . . was notable . . . .

### "Clinical Impressions of [Mother's] Disabilities and Impact on Bonding

"It would appear that [the agency's] involvement has aggravated an already volatile situation. However, this intervention occurred due to the parents['] pathologies, their unwillingness to seek help, and the compelling and enmeshed ways in which each parent was able to triangulate their extended family into their pathology. This process polarized these families and has created ongoing discord, anxiety, chaos, animosity and other pathology for these young children and the entire system . . . . This complex systemic 'splitting' screams Borderline Personality Disorder. Whether this is a feature of [mother's] diagnosis, a possible issue with [father], or coming from other parties or workers, is not clear. However, what is clear, is that there is clearly a pathological process that has ensnared this entire case, and will most greatly impact the ability of these children to maintain positive relationships with all family members. If the process can not be deactivated or disengaged from this borderline feature, severe limits will undoubtedly need to be established to buffer [Mickel] and Mallory from continually being sucked in and confused. [¶] . . . [¶]

"[Maternal grandparents'] home was warm and welcoming, neat and tidy, organized, cozy, kid-friendly and appeared totally acceptable to me as a home environment. Both [maternal grandparents] are from large families and have plenty of experience raising kids and interacting with them. [Maternal grandmother] in particular, was quite hospitable and gracious. [Maternal grandfather] is so upset and angry by the circumstances, that his negativity and pessimism spill[] out uncontrolled at the slightest trigger. This level of frustration in [maternal grandfather] is also seen in [mother]. There is a family pattern of suspiciousness and defiance in [maternal grandfather] and [mother], and this behavior is also evidenced in both of the children. Yet, in my observations of their interactions with the children, they were both appropriate, nurturing and positive. However, if their overall pattern is more pessimistic, controlling, demanding or hot tempered, this eventually will impact the children. [¶] . . . [¶] . . . That [maternal grandparents] were a more stable constant for these children was probably one of the most important factors in their resilience to be doing as well as they are at this time, in my opinion. [¶] . . . [¶]

## "Summary of Bonding Study

"[Mickel] is a mixed race (Asian/Caucasian) 6 year old male with an abuse and trauma history dating back to at least 6 months in utero. At 3 years of age, he was removed from his home and proceeded to be moved 4 times. His behavior was reportedly active, impulsive and disruptive when in his mother's custody, and continues to be so now. Per the [paternal grandparents'], and [the social worker's] reports, [Mickel] has academically grown and developed substantially. Per the [maternal grandparents'] reports to me, [Mickel] regressed from the stress of his detention, and his functioning after removal is not a good measure of his abilities prior to that time. [Mickel] exhibits depression, anxiety, oppositional defiance, aggression, impulsiveness, and rapid mood swings with intense emotionality. He misses [maternal grandfather] and [father], and wants reassurance that [mother] loves him. In fact, he seeks reassurance also from [paternal grandparents]. He frequently asked the adults if they wanted him. He is insecure in his attachments, enmeshed in his bond with [maternal grandfather], and uses some avoidance attachment in relationship with his grandmothers. His play is extremely violent and aggressive. He expressed with much vehemence, how much he hates the fighting that his parents and [maternal grandfather] have done with each other. He remembers [mother] pulling [paternal grandmother's] hair. It is very upsetting to him.

"Mallory is a mixed race (Asian/Caucasian) 2 years and 10 month old female child, separated from her primary caregivers at 3 months of age, and moved in about 3 month intervals two more times, settled into a relative placement for 8 months under the age of 1, and was again moved to be placed with [paternal grandparents]. Her behavior is impulsive, with poor boundaries and indiscriminate affection. She exhibits some oppositional defiance. She displays moody, whiny behavior with sudden behavioral changes, and frequent pouty affect alternating with sassy, silly behavior. Her early disrupted attachments concern me as a potential risk factor. She is developing well, with good physical coordination, and manual dexterity for a young child her age. She is very fond of her families, but is particularly partial to [paternal grandfather]. She has an ambivalent attachment to [paternal grandmother], in my opinion, with resistance and struggling, yet clingy behavior.

"All of the adults appeared to have some anxiety issues, which manifested itself differently in the ways they attempted to relate to the children, and how well they were able to be responsive. Each family has a distinct style of relating, and because the children were raised in the [maternal grandparents'] home initially, and perhaps for other biological reasons, the children exhibit a more complementary style of relating with [maternal grandparents], but one

which clashes with [paternal grandparents]. [¶] However, the children appear to feel settled and safe at [paternal grandparents'], and continue to persist in trying to get [paternal grandparents] to relate to them in ways which are playful, nurturing, but with firm limit setting. They readily tell [paternal grandparents] that they love them and seek physical closeness."

On August 26, 2008, reunification services for father were terminated and a section 366.26 hearing set. The children remained in paternal grandparents' home and the court ordered monthly visits for mother and maternal grandparents.

On September 5, 2008, the expert wrote an addendum report directly to the juvenile court, voicing her concerns about the way the social worker, Sandra Contreras, was handling the case. She stated:

"I am writing directly to you, in response to questions posed by one of the attorney[s] in this matter, [maternal grandparents' counsel]. [Counsel] has requested my recommendations in the above matter as they pertain to termination of parental rights, possible detriment of harm or impact on the children, and whether termination of contact with the maternal grandparents would be detrimental to the children. I left [maternal grandparents' counsel] a message that Ms. Sandra Contreras, social worker with [the agency,] has on at least two occasions, during the final preparation of my previous report, adamantly insisted that I not provide any recommendations, but only address the nature and quality of the relationships and bonds with the parties involved. Obviously, [maternal grandparents' counsel] is frustrated with this turn of events. He has determined that [the social worker] is 'meddling'. [Maternal grandparents] would view this as continuing obstruction.

"Therefore, I have decided to write directly to the Court, who ordered this report. I was instructed to provide my findings only to [the social worker], who has been the liaison between the Court and myself, and provided all information as to what was needed in the assessment. However, normally, I would prepare my report directly for the Court.

"Therefore, please find enclosed, my findings in response to [maternal grandparents' counsel's] questions. I am sending them directly to you, as I believe that this case has been compromised, and controlled by [the social worker's] adamant resistance to my requests to observe the children in the maternal grandparent[s'] home, which was only possible after County Counsel advised her to cooperate with me, and my questioning the restraining of any recommendations that I might offer. [Maternal grandparents'] concern that the agency is doing everything in their power to undermine their relationship with their only grandchildren does appear to have some merit based on my observations of the process to accomplish this assessment."

The expert then explained that she had discovered a " 'cloud of suspicion' " over maternal grandfather that she could only substantiate "through rumor, innuendo, fears and suspicions . . . ." She said: "[B]ut [it] has no basis in any evidence, yet it is coloring all decisions that have been made in this case regarding [maternal grandfather], as far as I can tell." The expert continued:

"There is a belief that [maternal grandfather] has been sexually inappropriate with [Mickel], or that he will be, based on the following reports: [O]nce [maternal grandfather] brought [Mickel] to the [paternal grandparents'] home for a visit and advised [paternal grandfather] that [Mickel] had diarrhea and was 'bleeding from the butt'. Social worker concerns regarding the close physical proximity, touch and whispers between [Mickel] and [maternal grandfather have] raised suspicions. Community rumors that [maternal grandmother] is never seen at the home, and 'probably' does not live there, [have] fueled concerns that their life is a lie and a cover so that [maternal grandfather] can get the boy back for himself. The belief that [Mickel] slept with [maternal grandfather] and that [maternal grandmother] was allegedly not present, has raised suspicions that something untoward may have occurred. The upset and anger over believing that [maternal grandfather] lied when he told [paternal grandparents] that the whole family was going camping, only to learn upon their return that only [maternal grandfather] and [Mickel] went camping, and [Mickel] seemed upset and very closed about the trip, only saying he didn't like it, led [paternal grandparents] and the social worker to believe that he must have been molested on this trip. I saw pictures from that camping trip in which [Mickel] appeared happy.

"For whatever reason, suspicion, rumor and innuendo have been allowed to run rampant in this case, and has determined the removal of these children from [maternal grandparents'] home, and the resistance on the part of the [agency's] social workers from working with them to return the children to their home. However, the workers have never addressed these issues that I could determine. I asked their attorney if there were sexual abuse issues in this case and his response was 'there better not be' as they had not been addressed. I asked the social worker . . . and both sets of grandparents. Only [paternal grandparents] and [the social worker] alluded to their suspicions with the above examples. [Maternal grandparents] also were upset that there might be such a belief, and that it had not been addressed.

"I believe that it is important that this issue be brought out into the open. It is impossible for [maternal grandparents] to address it or defend themselves if they don't know they are being accused. It answers many of the questions that they have about 'why' the decisions in this case have gone the way they have."

The expert proceeded with her report, as follows:

## "Impact of Domestic Violence

"Having said that, I will say that although I believe that [Mickel] is most intensely bonded with [maternal grandfather], and the [maternal grandparents] appear far more emotionally invested and attached to [Mickel], [Mickel] is very clear that he feels most secure now in [paternal grandparents'] home. He has been able to verbalize to me his anger, hurt and frustration on several occasions because his mother, father and [maternal grandfather] all fight. He states, 'I hate, Hate, HATE!!!!! that they fight!!!' He appears to want to go home to [maternal grandparents' home], but not now, not anymore, because of the domestic violence. I believe that if there was no more animosity and anger, that yes, under good circumstances, [Mickel] would want to go 'home' to [maternal grandparents]. However, at this point, he appears more emotionally settled and stable in [paternal grandparents'] home, and is putting down roots with [paternal grandmother] in ways that show me he is relying on her help emotionally.

"I believe that the children probably should have been placed with [maternal grandparents] as long as they did not leave the children alone with [mother], but I understand that that did occur. If they were out of compliance with the requirements, and they were uncooperative with the Orders or other matters, this may have led to the reasons the social workers stopped working with them, when they found other available family who appeared suitable for placement.

"I do not see the same evidence of bond and attachment with Mallory. She seems to have 'fun' with [maternal grandparents], but what child wouldn't when they are showered with gifts and food? She is left to the attention of the womenfolk who appeared to be appropriate with her and are clearly attached to her.

"The challenge of this case, is that [Mickel] is most bonded to [maternal grandfather] and [paternal grandmother]. Mallory is most attached to [paternal grandfather] and [paternal grandmother]. Both children are fond of both . . . families and want all of them in their lives. Each family has animosity toward the other which has become destructive and created chaos and discord.

## "Impact of Placement Disruption on Children's Current Needs

"Early on in this case, I believe the children could have returned to [maternal grandparents], unless workers could substantiate proof to their

concerns. At this point, after all the disruption, domestic violence, and interrupted attachments, I would say that the children are more stable being left with [paternal grandparents], but that they could benefit from an ongoing relationship with the rest of their family. The challenge is, however, that if the family continues to stir up trouble, to fight, to undermine [paternal grandparents], this is absolutely detrimental to these children. I believe that the optimum goal for [Mickel] and Mallory would be to provide them with stability in [paternal grandparents'] home, with regular and consistent home visitation with [maternal grandparents] two times a month, initially. I would recommend a half day visit for the first occurrence, a full day visit for the next, and assuming that the children and families can handle these arrangements, continue with a full day, i.e. Saturday, two times a month for three months. If this arrangement can be conducted civilly, without malice, and the children can settle into it, trusting that they can spend time with their family, and return again, I would hope that they could develop a normal, healthy grandparent relationship with [maternal grandparents], with regular, frequent visitation, and as long as [mother] is supervised or not present.

### "Secure Base

"The struggle I have with this case, is that [Mickel] sees [maternal grandparents'] home as his 'home'. However, the relationships, though warm, are skewed, unpredictable, and put [Mickel] right back into an environment where he worries about when the next fight will be. He appears to have been deeply affected by the domestic violence, anger and rage that he has witnessed not only by his parents, but also by [maternal grandfather]. Although he loves [maternal grandfather], he is very frustrated that his life has been affected by this fighting. He appears to feel secure and safe where he is now, and because he shows much evidence of trauma from the domestic violence, I believe that it would be emotionally detrimental to him to move him from a secure base, back into a situation where this could continue to occur between [maternal grandfather] and [mother]. If [mother] no longer lived in the home, perhaps it would be more possible. Although she has an apartment where visits have been occurring, no one else believes she actually stays there.[4] She does still have a room that is full and lived in at [maternal grandparents'] residence, that indicates to me that she is most likely residing, at least predominantly with her parents.

### "Tragic Choices

"[Mother's] problems are such that her parents will most likely be helping her the rest of their life. The tragedy here is that [maternal grandparents] are

---

[4] The expert later testified that "no one else" referred to the social worker and paternal grandparents.

faced with needing to help their adult daughter, while wanting to have their grandchildren in their life. That the children were taken from them, and not returned in a timely manner appears to have been due to [maternal grandfather's] angry attitude, and the 'cloud of suspicion' over him and their living arrangements.

"I believe that if the children never saw their parents again, it would be less detrimental to Mallory, than [Mickel], but most painful would be the loss of [maternal grandfather]. I believe that it would be traumatic for [Mickel] if he lost all contact with [maternal grandparents]. . . . [¶] Mallory would in my opinion, not be as impacted. She might ask about them for awhile, because she has had regular contact with them, but I do not see her being devastated at the loss of contact, due to her attachment problems that probably resulted due to her repeated moves at a crucial time in psychological development of attachment. [Mickel] would be devastated, and has been. . . . [¶] . . . [¶]

### "Summary

"In summary, due to Mallory's early disruption of a stable attachment in the crucial first 3 to 18 months of life, her best chance of stabilizing and developing normally rests in not disrupting the current placement, where she appears to be developing an attachment to both [paternal grandparents].

"[Mickel], being older at detention, and clearly bonded and attached to [maternal grandfather], has had an emotionally difficult time adjusting to multiple placements away from [maternal grandfather]. [Mickel] has much anger and aggression, emotional impulsivity, depression, anxiety and suspiciousness (which mirrors some of [maternal grandfather's] emotions). He is acting out his conflicts (and possibly some of [maternal grandfather's] feelings) and would benefit from ongoing therapy to help him with his domestic violence exposure and trauma, as well as grief and loss issues from the detention, and blurred emotional boundaries. He appears to be testing limits with [paternal grandparents], but also seeking nurturance, playfulness and relationship in ways that support a child and parent bond. He is able to verbalize to me his frustrations, fears, sadness, and the sense that he feels safe and secure with [paternal grandparents]. He would be most detrimentally impacted by the severing of familial relationships with [maternal grandparents], but would probably have a poorer long-range prognosis if removed from [paternal grandparents] and placed with [maternal grandparents], unless extensive services were provided to [maternal grandparents] and then evaluated at a later date. I would recommend a Theraplay model of intervention if this were done."

On April 20, 2009, the expert wrote a second letter directly to the court, addressing section 366.26, as requested by maternal grandparents' counsel

and mother's counsel. The expert stated she believed that paternal grandparents were reluctantly going forward with adoption, not because they did not love the children, but because they were not planning on raising another family. The expert believed that they were providing a stable environment and that legal guardianship, not adoption, was the more appropriate arrangement. She also stated that the children were stable in paternal grandparents' home and returning them to mother would be detrimental to them. "However, the primary caregiver was the maternal grandfather, and termination of contact with him and the extended family *would* be detrimental to [Mickel]." The expert believed that termination of contact would not be emotionally detrimental to Mallory, but she would lose contact with her ethnic heritage.

The expert also stated:

"The dilemma that I have, as the evaluator of the bonding task I was presented with, is that although I was asked to explore the children's attachment to the [maternal grandparents], and found that a primary attachment and bond does exist with [maternal grandfather] and [Mickel], there was never a legal establishment of guardianship with [maternal grandparents]. . . . [¶] However, in terms of the actuality of the legal termination of the mother's parental rights effectively barring a relationship between [Mickel] and his primary bonded and attachment figure with [maternal grandfather], I believe there is a detriment to him, most definitely.

"Finally, I must qualify, that I have not seen any of the members of this family in my office for 8 months, and I do not know what has transpired during that time. If there is a way for [maternal grandparent] contact to continue, I would strongly recommend preserving this relationship. However, having said that, if they persist in trying to disrupt the stability of the placement with [paternal grandparents], then I see no way around the reality that termination with [maternal grandparents] would be necessary to ensure the stability of the placement without emotional disruption and anxiety for the children."

On April 20, 2009, a combined hearing commenced on the section 388 petition and the section 366.26 matter. The hearing took place during nine sessions over the course of 11 months. Testifying at the hearing were the social worker; the expert; another social worker, Kathleen Campell; Debbie Johnson, a witness to an incident involving paternal grandmother and Mallory; maternal grandparents; paternal grandfather; and the paternal aunt.

On June 12, 2009, maternal grandparents filed an amended section 388 petition, including notes and photographs. Maternal grandparents requested placement of the children in their home or unsupervised visitation. They

explained that the changes would benefit the children because the children were bonded to them and had been since well before the dependency proceedings had begun, paternal grandparents were not providing proper care, and the children were being emotionally abused in paternal grandparents' home.

At the hearing, the expert testified that she had been requested by the social worker to report on whom the children identified as their primary parental figure and on the nature of the relationship of bonding and attachment with each parent and each grandparent. The social worker informed the expert that there was tension and conflict between the two families. This was the only time the expert had done this type of study without being asked to come to any conclusions or make any recommendations. In fact, the expert received at least two telephone calls from the social worker, specifically telling her not to make any recommendations in her report. The expert was puzzled by this demand and the social worker never provided her rationale. The expert could not reach the social worker, who left repeated messages for the expert stating, "Please, please, do not give any recommendations as to placement or custody of the children." After the expert submitted her report, she learned that parental rights might be terminated. The social worker did not return the expert's subsequent messages either.

When the expert observed the parties in her office setting, she found all of the adults to be very tense, nervous, and anxious. She felt she needed to observe them in their natural setting where she could get a more authentic view of their interactions. The social worker, however, left the expert a message stating that she was strongly opposed to the expert's observing Mickel in maternal grandparents' home and that paternal grandparents had some concerns about it too. Nevertheless, the expert insisted and ultimately conducted a visit in maternal grandparents' home.

The expert testified about that home visit:

"I observed that [maternal grandfather] was very responsive, um, and is able to adapt and meet Mickel where Mickel is, and Mickel was very responsive to that. I could note that [maternal grandfather] is able to help Mickel regulate himself, um, where he tends to be impulsive and excitable. I found that [maternal grandfather] was able to soothe him and to redirect him easily and gently. He was very nurturing with Mickel. Mickel was very responsive to that. [¶] There was appropriate playing, it was developmentally appropriate. There was much pleasure and enjoyment between them. There was warmth and smiling and eye contact, shaking of the body. [¶] . . . [¶]

"[There was v]ery little contact [between Mallory and maternal grandfather]. [Maternal grandfather] primarily focuses on Mickel. Mallory was

primarily, um, involved with both [mother and maternal grandmother.] And she enjoys the attention she gets from them and they were very delighted to see her and to interact with her, but it was a different quality, and, um, less intense. [¶] [Maternal grandfather's] interactions were side notes to his relationship with Mickel."

The expert testified that Mickel was bonded to maternal grandparents, particularly to maternal grandfather. Mickel was "definitely bonded primarily" to maternal grandfather. The expert stated:

"Well, from my study, it appears that [maternal grandfather] has probably been the primary caretaker in the first three years of [Mickel's] life, which were pretty significant in those years. It sounds like there was a lot of chaotic kind of back and forth. And so . . . the [maternal] grandparents' home, and I think primarily [maternal grandfather], provided what stability there was for him in his early life. So I see Mickel as seeking him out and seeking reassurance and acceptance from him. [¶] I see [Mickel] emotionally vulnerable with [maternal grandfather] like I didn't see with any of the other adults. But I do believe that each of the attachments with each of these children, um, have challenges. And so for Mickel with [maternal grandfather], as I mentioned in the report, it's almost unmatched. It is a very intense relationship, and it's at the exclusion of the females in the relationship. So there are places where I think there could be work on helping [maternal grandfather] be able to encourage Mickel to be more respectful to the females in the relationship or to become more involved in things that involve the females in the relationship. [¶] It was . . . kind of skewed. They would kind of go off and do their thing together when I observed in the home, which is pretty consistent with what the social workers were observing [in the agency setting]. [¶] But, overall, I thought it was the most authentic, spontaneous genuine moment of all. It was the most real looking relationship. It was natural. He, Mickel, looked like he was a part of [maternal grandfather's] family. I mean, they just really—they fit together. [¶] . . . [¶]

"I believe that Mickel's relationship is very special with [maternal grandfather] and that if there was a way to help these two families realize that the children love them both, they need them both, and have verbally expressed that to me, that they want their family just to get along. They love them and need them and identify them all as their family. [¶] So I believe that it would be beneficial for Mickel to maintain a relationship with his own real family and with his grandparents and, particularly, with [maternal grandfather] based on that bond and attachment.

"However, if—I understand the social worker's challenge that if the families are provocative or if there is, you know, things that are disrupting the

life of the child, the stability of the child, if there's things that continually inflame the situation, that it becomes a real challenge to maintain the relationship. [¶] So if there was a way for the roles to be settled, if they're going to stay with [paternal grandparents], then it is understood there's no turning back, that there is no other option to go home to the [maternal grandparents] but that they could maintain their relationship with the [maternal grandparents] as grandparents and there was a way to get some mediation or some coparenting counseling-type, um, work done for these two families, then I think it would be in Mickel's best interest to maintain the relationship with [maternal grandparents].

"If those things cannot be accomplished and it continues to be inflammatory or there continues to be hope that, well, we're going to keep fighting, we're going to get you back, at this point, I'm not sure that's serving the children in their best need. So it really depends on all of the adults being able to recognize you've got to put your weapons down and recognize these children need all of them. The children need all of them."

The expert explained that primary bonds are crucial for children. She said: ". . . [Mickel] definitely appears to have the closest, most nurturing, secure-based kind of relationship with [maternal grandfather]. However, there have been environmental incidences that have happened that have impacted his ability to feel safe there. [¶] . . . [¶] . . . I believe that he has a secure basis with [maternal grandfather]; however, there's been a lot of disruption and chaos in this little boy's life. And because there were conflicts between [maternal grandfather] and [mother], I think that he's become insecure in his ability to feel safe there."

The expert continued:

"What I would say in reviewing all of [the] documents in this case and in meeting all of the adults and the children, I could not come to the same conclusion that the social workers came to. I was surprised that the children were not returned to the [maternal grandparents] or when—I guess they were briefly—why they were removed again. [¶] So way back when, I would have hoped that there would have been a return of the children to their primary home with—work with [maternal grandparents] and/or the mother to see if there was a way to resolve that problem.

"I think removing the children permanently from [maternal grandparents] was emotionally very hard for Mickel because of his attachment and I think was very disruptive to Mallory because of how young she was and the necessity for her to bond with somebody. That was a lot of change in her caregivers."

The expert explained that once a child has formed a primary bond, it can be very devastating if it is broken. When asked whether she believed it would be detrimental to Mickel if the bond between him and maternal grandfather were broken, the expert responded:

"I think that's complex. I believe that from everything that I saw, he has a good quality relationship with [maternal] grandfather. It is skewed because there is not the same kind of support for a relationship with [maternal grandmother]. Um, there is something going on there where the males are bonding, but there is not as much of a relationship with the females. And it shows up in the home in the [paternal grandparents] because he's given [paternal grandmother] quite a bit of problem. He's given [paternal grandmother] more of a problem than he's given anyone else, and I think that's related to something going on with his relationship with women. [¶] . . . [¶] . . . [F]rom the view of, um, the experience of [paternal grandparents], and I think the view of the social workers, there's been a lot of anger and frustration, a lot of tension and conflicts between the two families. If that level of tension and disruption should continue, then I think the—that that is very disruptive and detrimental to the children. [¶] If that level of tension could be reduced and everything had clear boundaries and they were not, um—you know, some of the examples were there were concerns about—and this isn't towards [maternal grandparents] but I think more towards the mother . . . kind of prank calls, hang-up calls in the middle of the night and false, you know, calls for police to show up with lots of cop cars when there was nothing and just kind of disruptive stuff constantly aggravating the situation. If that continues, then I think it's detrimental for the relationship to still be open. And I think that's why the social worker has recommended that it not be. [¶] But I think that [maternal grandparents] have felt that they—they weren't getting the same kind of services and that they've been frightened that they were going to lose the only grandchildren that they have, and so there is just a lot of tension.

"So it's not a simple answer. If the conflict between the families continues, then I think that's detrimental to the children, and I think that's where the social worker's coming from. I'm not convinced that there can't be a resolution and that there can't be clearer boundaries set with [maternal grandparents] so that they can maintain a relationship. [¶] . . . [¶]

"I think it—emotionally, I think [ending the relationship with maternal grandparents] could be very hard for [Mickel] even to the point of being devastating. But he has maybe more calmness now. I don't know what's transpired in the last eight months. I haven't seen this family for eight months so I have to qualify that. But I think emotionally he's got a very close bond, and I think it would be very hard for him to lose the quality of that

relationship. I think [maternal grandfather] is the one guy that really understands him. I think he's the one that he can come alongside and he knows that [maternal grandfather] gets it."

When asked whether she was able to determine the reason that maternal grandparents were having only supervised visits, in light of all her observations and all the documents she had reviewed, the expert answered that she had a professional guess. She explained: "I believe, in this case, um—well, I need to preface that. When I worked for the County as a Child Protective Service worker, I specialized in some particular forms of cases. And when I looked at all of the documents in this case, I had—I was under the impression that it was a particular—particular type of case. And when I approached each of the adults to ask them and to ask the social worker, um, I was able to get a little clearer understanding of why the case had gone the way it has. [¶] . . . [¶] I believe that there is a—I believe that there is a belief, an assumption, a concern that's never been really fully checked out or there hasn't been a way to prove it, but it—I think it has really formed the direction this case has taken."

In the expert's professional opinion, she had no conclusive evidence that either maternal grandparent would pose a threat of harm to the children if they were to have unsupervised visits. The expert did, however, have concerns about maternal grandmother's statements that could influence or confuse the children. For example, maternal grandmother said to Mickel in the expert's presence, "Tell [the expert] you want to come home." No other adult talked to the children in that way, but that was the type of problem the social workers were concerned about in unsupervised visits. The families need to understand that those comments, even if coming from love, care, and fear, can confound the problem and confuse the children. The expert believed that maternal grandparents would comply with a court order to keep mother away from the children. The expert explained: "I believe that [maternal grandparents] have been frightened of losing their only grandchildren and they have done everything in their power in the only way they knew how with great anxiety and distress to try to, you know, get their family back or—or deal with this. Unfortunately, they were the wrong choices, and it's complicated this case, created a lot of tension. If they could be led to understand that there's a way to maintain the relationship where their conduct is crucial to that continuing, that they behave in a more acceptable way and that's defined, um, I would hope that they could."

When asked if she believed part of the problem had been the treatment maternal grandparents had received from the agency, the expert stated: "I believe that the problem has been the perception of [maternal grandparents] without substantiated evidence."

Later, the expert stated: "When I took this case on, pretty quickly I was confused by some of the determinations and circumstances of the case. I was a sex abuse social worker for a number of years, and it looked like a sex abuse case to me. And so I started asking the different individuals, um, and if there was—I asked the social worker and the attorneys, some of the attorneys, and I was able to get some confirmation that there was some suspicion on the part of the social worker and [paternal grandparents]. However, there was no knowledge of there being anything that had ever been, um—you know, it hadn't been opened up as a sex abuse case or investigated. I asked for all the court documents, all the social worker[']s papers. There was a huge packet of stuff. I went through everything. I talked to everyone. I could find nothing that could substantiate that it was officially a sex abuse case, and yet it was handled like one. [¶] . . . [¶] There was—I could not find indications for why the children had not been returned, first of all, to the [maternal grandparents'] home. They had passed the home inspection, but there was great resistance. There was a lot of upset and concern—there was some vacations that Mickel went along with [maternal grandfather]. Well, there was—um, well, as I outlined in the papers, there were certain examples that were presented to me as indicating why there was suspicion, but those examples were really not something that would substantiate a case. They were more suspicions, and I couldn't substantiate that there was anything further to determine it as a sex abuse case. [¶] . . . [¶] It appeared to me [the social workers] were [handling it as a sex abuse case]. [¶] . . . [¶] There was a lot of concern. They were really observing [maternal grandfather's] movements. They were reading into the close proximity, the physical close proximity, the boundary issues between the child and the adult. They were concerned about whispering and contact and just really kind of seemed to scrutinize the behavior in ways that the social workers appeared to be alarmed at and concerned about as a boundary issue, as a personal space boundary issue. [¶] . . . [¶] . . . I suppose there could be some [personal space boundary issues] that are not [sex-abuse related]. But in the context in which this case was handled and the comments that were made, it appeared to be that those boundary personal space issues were being interpreted as potentially inappropriate touch, inappropriate boundary, colluding with secrets, which kind of go hand [in] hand with sexual abuse."

When asked about the possibility that the bond between Mickel and maternal grandfather could be unhealthy, the expert answered:

"I think it's out of balance. [¶] . . . [¶] I believe that there is something very special between Mickel and [maternal grandfather]. I was not concerned or alarmed by the love that they showed for each other or the nurturance or care 'cause that was a beautiful relationship; but because in the home visits it came at the expense of showing respect to [maternal] grandmother or to mother when they spoke to him, those are ways that [maternal grandfather]

could help him socialize more to reinforce by saying 'answer your grandmother' or 'answer your mother' and 'we don't talk to mom that way.' And that was lacking. So in those ways I think there was some absence of some redirection that could be productive if it was introduced. [¶] . . . [¶]

". . . I saw nothing in my bonding study in any of the observations that I had or any of the discussions that I had with any of the adults or any of the children together or alone that caused me to feel that there was a risk of harm or something particularly peculiar or odd about the relationship. [¶] As I've stated before, I believe that all of the adults, and particularly [maternal grandparents], are under great emotional duress and have anxiety, and I believe that some of this is coming out of their anxiety."

Later, on the same subject, the expert stated: "I was specifically referring to . . . the imbalance in the attachment with [maternal grandfather] and the kind of ignoring or disrespect to the females in the family, that they're—I think that's trainable. I think there's a way to train the adults in how to do behavior management to expect something different from him and how to reinforce and encourage an integration of more interaction with the females in the family."

The expert explained: "I believe that, given everything that's transpired, that it would probably be, at this point, disruptive to remove [the children] from [paternal grandparents], but it would also be disruptive to sever the relationship with [maternal grandparents]."

The expert opined that termination of maternal grandparents' relationship with Mickel would be detrimental to him. She continued: "The relationship that I observed indicated that Mickel has primarily identified [maternal grandfather] as the primary attachment and support base, um, that is his home. That's his connection. That's where he feels happy and loved. And I think to lose that significant relationship completely would be very hard for him. I think it could present in some issues of depression or other problems later on for him."

The expert recommended unsupervised visitation with maternal grandparents. She stated that home visits with maternal grandparents would reduce anxiety so maternal grandparents could develop the relationships rather than reassuring the children that they are loved. Having longer and more frequent visits would allow them to move beyond showering the children with gifts and the indulgent behavior they exhibited when they saw the children only one hour per month. These home visits would provide a better assessment of how the interactions were going. This plan was for the benefit of the children, particularly Mickel.

The expert believed that as long as mother was in maternal grandparents' home, there was a risk of arguing, fighting, and altercation. If mother were not in the home, the children would feel more at ease. Mickel was conflicted because he loved maternal grandparents and missed his home, but he did not feel safe there. If the court ordered visitation, but there was still ongoing family discord, stirring up of trouble, and undermining of paternal grandparents, that would continue to be a disruptive or undermining influence for the children. Mother's presence in the home was a major concern.

The expert said she referred in her September 5, 2008 letter to continuing to stir up trouble because paternal grandparents felt that there was disruption to their lives. The expert was not aware that anyone was arguing, but paternal grandparents had expressed some concern that they were continuing to have problems. The expert explained: "The purpose in—doing the visitation in the home and for extended periods of time, I think would reduce the anxiety and the anger and the resistance that [maternal grandparents] have demonstrated to the social workers. And I think if they were assured that they had a relationship with their grandchildren, that that might reduce their need to be as disruptive to the placement. If they understood this is the only way that they're going to be able to have contact, that it could change the circumstances that have been evidenced so far."

As for paternal grandparents, the expert believed they, like all the adults in this case, needed services. Paternal grandfather worked out of town during the week and came home on Friday for the weekend. "So he's always re-entering the home. And what I see from many families where there is somebody commuting and re-entering the home on a weekly basis is there is often an imbalance of power and there is a struggle for re-establishing authority." Paternal grandmother worked, and she was responsible for getting the children ready for school every day, feeding them dinner, and tucking them in.

Maternal grandparents introduced evidence of videos of a supervised visit in October 2009 and an unsupervised visit the court allowed at Christmas 2009. In the October visit, after the children excitedly greeted maternal grandparents, Mickel asked maternal grandfather when he was coming home. Maternal grandfather responded, "That's a good question. We're going to court next week to talk to the judge." Then he told Mickel to "[s]ay [his] prayers to ask God to come home." Mickel agreed and maternal grandfather told him he was a good boy.

On April 9, 2010, the court issued its 12-page written ruling, in which it denied maternal grandparents' section 388 petition, and terminated parental rights.

At the April 19, 2010 hearing, the court formalized its ruling. The next hearing was set for October 18, 2010, for an adoption review pursuant to section 366.3. When the court asked if there were any other matters to address, maternal grandparents' counsel requested that the court reconsider allowing maternal grandparents unsupervised visits. The court responded that it would not reconsider unsupervised visitation. The court stated that it felt maternal grandfather's response to Mickel's question in October 2009 was not appropriate at all—"to even suggest [to Mickel] that he's coming home or praying to God that he would come home. [¶] I realize the emotions are involved, but to me it could have been handled differently. And I don't know at some point I believe these children do need some peace in their lives. It seems like it's been a lot of upheaval. So I wouldn't consider unsupervised visits. I don't know what the agency, as far as doing twice a month, supervised."

County counsel responded that continued visitation, in light of the direction the case was taking, was "simply an invitation to continued litigation for as—until the adoption is finalized. [¶] I think it's much better for the parties and the children for any visitation to be worked out between [maternal grandparents] and [paternal grandparents]. That's what's going to happen after the adoption. . . . [¶] [The agency's] position is if there's going to be contact between [Mickel] and his maternal grandparents, that should be in the hands of the prospective adoptive parents."

Children's counsel agreed that expediting the adoption was the goal and "to continue with visitation, even in a supervised setting, [would] continue an invitation for interruption or challenge to the efficient adoption proceedings. So [he was] opposed to it."

Paternal grandparents' counsel stated: "I would agree with [county counsel], and also say that I spoke with my client[s], and they are certainly willing to discuss the issue with [maternal grandparents]. They promise no particular outcome at this point. I don't know that it serves anybody good to continue supervised visits when the long term prospect is parental rights are expected, or the visitation for formal visitations expected to be terminated."

The court stated, "You know, I really thought about this a lot." The following then occurred:

"[MATERNAL GRANDPARENTS' COUNSEL]: . . . I'm simply asking based on what the Court found as to [the] continued relationship with the maternal grandparents and the benefit to the [children].

"THE COURT: Well, . . . I—I don't disagree with that. . . . I certainly encourage [paternal grandparents] and [maternal grandparents to] somehow

engage in mediation and arrange some type of normal grandparent relationship. [¶] But at this point I'm just going to leave it as is. I really think that all parties need to move forward, and I would agree, I think if I change it at this point, it's probably going to lead to more litigation, so I'm going to leave [it] as it stands. [¶] . . . [¶]

"[COUNTY COUNSEL]: . . . [F]or the reasons stated by me, by [children's counsel], and by you in the written ruling, court-ordered visitation supervised by the agency is going to be counter to the goal of permanence through adoption and will put off, until the—either we're back here after the appeal, or at some point in the proceedings [maternal grandparents] and [paternal grandparents] are going to have to learn to get along and manage this. [¶] You've already . . . denied the [section] 388 petition for unsupervised visitation. We're moving the children, terminating parental rights, ordered adoption as the permanent plan. . . . [W]e just think [visitation] is counter to the stated goal of permanency through adoption. [¶] . . . [¶]

"THE COURT: My understanding, when I issued my ruling, would be that there would not be any further visits, unless [paternal grandparents] were agreeable. That's why I was thinking the case needs to move on. . . . [¶] . . . [¶]

"[MATERNAL GRANDPARENTS' COUNSEL]: . . . [¶] Your Honor, the matter of terminat[ion], which is in essence what's being asked for is a termination of [maternal grandparents'] visitation with the children hasn't been asked for or contemplated. . . .

"THE COURT: But, [maternal grandparents' counsel], that is encompassed within the order under the [section 366].26. That was my understanding that it all involves that issue.

"[MATERNAL GRANDPARENTS' COUNSEL]: But, your Honor, there's—clearly there's a difference between defacto parent and the relative. And while [maternal grandparents] are the maternal grandparents, they are also defacto parents. Their status continues on. That status does not terminate by way of a [section 366].26 order that terminates parental rights.

"THE COURT: I think [county counsel], as I understood him, I would have the authority to order visitations. I'm just saying within my ruling, my thinking was that there's going to be a change, the children will probably end up being adopted by [paternal grandparents] and it's going to be up to them whether or not there's visitation. . . . [¶] . . . [¶] . . . I realize [maternal grandparents] disagree[], but I feel they had a chance to present all the evidence they would want to present. My concern at this point really is for

the minors and what's best for them. And I think the important thing is stability, permanency, not to be constantly torn, 'are we going to go to this home, or that home?' I mean, I have to think of what's in the best interest of the minors. [¶] So at this point, I'm going to leave the order[] as it stands. So I'm not ordering any visitation. And so visitation would be left up to [paternal grandparents] and, I guess, the social worker. And if I'm correct, that's something you can raise on your appeal, as well, I guess.

"[MATERNAL GRANDPARENTS' COUNSEL]: I'll enter an objection to that. I'm absolutely beside myself. I'm sorry. I just don't understand. The Court required me to cross every T and dot every I. There is no motion before the Court, and those two issue[s] are separate. The Court's giving [paternal grandparents] the authority as to whether they'll have visits your Honor. Your Honor, [paternal grandparents] . . . it's not going to happen. It hasn't happened up to this point. [¶] And when it comes to the best interest of the children, your Honor, what about the children's best interest? So all of a sudden they're not going to see their grandparents anymore; they have no more contact? I'm not sure how that's in the children's best interest to suddenly, abruptly, without explanation, stop any contact with the maternal grandparents, which is why I think a change of circumstance should be demonstrated by the [agency], not a [section 366].26 ruling. That's not a change in circumstance . . . .

"THE COURT: Thank you, [maternal grandparents' counsel]. Your statements are on the record, but my ruling really speaks for itself. So I think we'll go forward from here.

"[MATERNAL GRANDPARENTS' COUNSEL]: I'm going to make a formal request for [a] visit in accordance with the best interest of the children. I understand it's probably a formal function, but I'm making an oral motion. I presume the Court will deny, but I want to put it on the record.

"THE COURT: Then I'm going to deny [it] again. I recognize especially with [Mickel's] relationship with [maternal grandfather], I mean there is obviously some benefit to it based on Ms. Russel[l]-Curry's testimony, but I think the greater interest is, just as I said, i[s] him having permanency, stability and some certainty."

"[MOTHER'S COUNSEL]: Then at the very least, your Honor, we are asking for at least a final visit. [¶] . . . [¶]

"THE COURT: I think [it] would be appropriate for them to have at least one more visit.

"[COUNTY COUNSEL]: Your Honor, excuse me. As to a visit with the mother, I don't think the Court has the authority to do that at . . . this point. As to [maternal grandparents], they had a visit Friday afternoon. [¶] . . . [¶]

"[MATERNAL GRANDPARENTS' COUNSEL]: And certainly [maternal grandparents] had no perception that would be potentially their last contact with the children.

"[COUNTY COUNSEL]: They were all there Friday afternoon, your Honor.

"THE COURT: They were all there. Well, you had received my ruling by then.

"[MATERNAL GRANDPARENTS' COUNSEL]: Your Honor, yes, and respectfully the ruling is absolutely devoid of any reference to changing visitation orders.

"THE COURT: Okay. Well, I thought it was fairly clear myself, but I'm going to leave—as I said, I don't want to rehash all this again. I'll leave it as it is. If they had a visit on Friday, then I think that's fairly close in time. So I'm going to leave it as it is."

## DISCUSSION

### I. *Section 388 Petition*

Maternal grandfather contends the denial of his section 388 petition requesting placement of the children or unsupervised visitation with the children was an abuse of discretion. We recognize that reasonable minds might differ as to the correct outcome in this case, but we cannot say the juvenile court abused its discretion.

Maternal grandfather points to evidence of the social worker's bias and lack of objectivity, including the social worker's search of his bags (for toys) before he was allowed to visit with the children on one occasion, the social worker's failure to investigate allegations of abuse and neglect at the hands of paternal grandparents, the social worker's failure to ensure that mediation took place,[5] the social worker's interference with the bonding study, and the

---

[5] Maternal grandfather argues that mediation was ordered by the court, but the record instead suggests the parties agreed to seek mediation. Thus, it was not the job of the social worker or the juvenile court to ensure the parties followed through with their own agreement. We note that the social worker testified that a provider met with the families and determined there was so much animosity between them that a family conference would not be appropriate.

social worker's inclusion of false information in her reports. The expert strongly believed that maternal grandfather had been treated with unsubstantiated suspicion by the agency. In fact, the expert was so disturbed by the agency's actions that she wrote two letters directly to the court.

We agree there were issues of credibility and impartiality in this case, but we also recognize that these issues of bias were before the juvenile court and were for the court to weigh and decide. "It is the [juvenile] court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence. We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53 [82 Cal.Rptr.2d 426].) The social worker's bias and the source of her information were vigorously explored by counsel during cross-examination. Thus, the juvenile court was made aware of the evidence to which maternal grandfather points.

Nevertheless, because of our concern, we rely on evidence apart from that provided by the two social workers and conclude this independent evidence supported the juvenile court's decision to deny maternal grandfather's section 388 petition. We will explain.

Section 388 allows a parent or other person with an interest in a dependent child to petition the juvenile court to change, modify, or set aside any previous order. (§ 388, subd. (a).) "Section 388 provides the 'escape mechanism' that . . . must be built into the process to allow the court to consider new information." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309 [19 Cal.Rptr.2d 544, 851 P.2d 826]; see also *In re Zacharia D.* (1993) 6 Cal.4th 435, 447 [24 Cal.Rptr.2d 751, 862 P.2d 751]; *In re Stephanie M.* (1994) 7 Cal.4th 295, 317 [27 Cal.Rptr.2d 595, 867 P.2d 706].) The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child. (§ 388; *Nahid H. v. Superior Court* (1997) 53 Cal.App.4th 1051, 1068 [62 Cal.Rptr.2d 281]; *In re Casey D., supra,* 70 Cal.App.4th at p. 47.) That is, "[i]t is not enough for [the petitioner] to show *just* a genuine change of circumstances under the statute. The [petitioner] must show that the undoing of the prior order would be in the best interests of the child. [Citation.]" (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529 [65 Cal.Rptr.2d 495].) Furthermore, the petitioner must show *changed*, not changing, circumstances. (*In re Casey D., supra,* at p. 47.) The change of circumstances or new evidence "must be of such significant nature that it requires a setting aside or modification of the challenged prior order." (*Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, 485 [229 Cal.Rptr. 771].)

In considering whether the petitioner has made the requisite showing, the juvenile court may consider the entire factual and procedural history of the case. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188–189 [19 Cal.Rptr.3d 801].) The court may consider factors such as the seriousness of the reason leading to the child's removal, the reason the problem was not resolved, the passage of time since the child's removal, the relative strength of the bonds with the child, the nature of the change of circumstance, and the reason the change was not made sooner. (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 446–447 [38 Cal.Rptr.3d 876].) In assessing the best interests of the child, "a primary consideration . . . is the goal of assuring stability and continuity." (*In re Stephanie M., supra,* 7 Cal.4th at p. 317.)

We review the juvenile court's denial of a section 388 petition for an abuse of discretion. (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71 [43 Cal.Rptr.3d 897].) The court "exceeds the limits of legal discretion by making an arbitrary, capricious or patently absurd determination." (*Ibid.*) The test for abuse of discretion is whether the court exceeded the bounds of reason. " [']The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citation.]" (*In re Stephanie M., supra,* 7 Cal.4th at pp. 318–319.)

Under this standard of review, we must conclude that the juvenile court did not abuse its discretion in ruling that the evidence did not establish that placing the children with maternal grandparents would be in the children's best interests, or that allowing unsupervised visitation with maternal grandparents would be in the children's best interests.

Although the expert recognized the strong and loving relationship between maternal grandfather and Mickel, and the critical importance of that bond in Mickel's life, she also unequivocally stated that Mickel and Mallory should not be moved from paternal grandparents' home. Mickel told her that he felt most secure now in paternal grandparents' home. She believed Mickel required the stability he had found with paternal grandparents, but also relied on his close relationship with maternal grandfather. As for Mallory, she was settled in paternal grandparents' home and was forming attachments to paternal grandparents. The expert opined that the optimal outcome for the children would be the stability and security of paternal grandparents' home, with frequent and regular home visitation with maternal grandparents. Thus, the expert's reports and testimony provided evidence to support the juvenile court's ·determination that moving the children from paternal grandparents' home to maternal grandparents' home would not be in the children's best interests.

And although the expert believed that the children could enjoy unsupervised visitation in maternal grandparents' home, she based her opinion on a situation without animosity, anger, and disruption. She stated that visitation could succeed if the arrangement were handled "civilly, without malice," and she stressed that "if the family continues to stir up trouble, to fight, to undermine [paternal grandparents], this is absolutely detrimental to these children." From this and other evidence, the juvenile court could reasonably conclude that unsupervised visitation, which had led to disruption, was not currently in the children's best interest.

The court's decisions to deny placement and unsupervised visitation were not arbitrary, capricious, or beyond the bounds of reason. The court's goal was to promote the children's best interests, which at this point were *permanency and stability (In re Stephanie M., supra,* 7 Cal.4th at p. 317), and to put an end to the upheaval in their troubled lives. While there was ample evidence that Mickel's relationship with maternal grandfather was positive and important, there was also evidence that maternal grandparents were creating confusion and disruption by talking about the case with the children and telling them they would be coming home. Maternal grandfather's anger was manifested in Mickel's attitude and he was acting out with paternal grandmother.

Despite the outcome of this sad case, we are hopeful that the two sets of grandparents can rise above their personal conflicts and create an open, extended family for the benefit of these children. Maternal grandfather obviously plays an important role in Mickel's life, which, if managed for the good of Mickel, could continue to nurture and support him even if he is adopted by paternal grandparents. We sincerely hope the grandparents, all of whom are beneficial to and loved by the children, can work together to provide love and stability rather than discord, chaos, and confusion in the children's lives.

## II. *Termination of Supervised Visitation*

At the end of the final hearing, after terminating parental rights and denying maternal grandparents' section 388 petition, the juvenile court summarily terminated maternal grandparents' supervised visitation with the children, effectively severing all contact between them and extinguishing arguably the most important relationship in Mickel's life. Unrefuted evidence presented by the expert demonstrated that Mickel's relationship with maternal grandfather was the most closely attached and bonded relationship in Mickel's life. The bond between Mickel and maternal grandfather was "primary, fundamental and intense," and Mickel displayed authentic despair when required to leave maternal grandfather's presence.

■   We recognize that once parental rights are terminated and a child is referred for adoption, the department or licensed adoption agency "shall be responsible for the custody and supervision of the child and shall be entitled to the exclusive care and control of the child at all times until a petition for adoption . . . ." (§ 366.26, subd. (j).) In this regard, the agency's decisions during this period are subject to the juvenile court's review for abuse of discretion. (See *Department of Social Services v. Superior Court* (1997) 58 Cal.App.4th 721, 733–734 [68 Cal.Rptr.2d 239]; *Amber R. v. Superior Court* (2006) 139 Cal.App.4th 897, 900–903 [43 Cal.Rptr.3d 297].) In this case, termination of visitation was heavily promoted by county counsel and thereafter ordered by the court. The record demonstrates that the court and the parties ultimately agreed that the court had authority to terminate visitation. We conclude for the reasons we explain below that, regardless of whether the decision properly rested with the agency or the court, termination of visitation was an abuse of discretion.

First, termination of supervised visitation had never been an issue during the course of the prolonged hearing. After the juvenile court issued its written ruling, a hearing was held to discuss the ruling. Because the section 388 petition had been denied, maternal grandparents' counsel orally requested increased supervised visitation. In response, county counsel suggested that in light of the adoption goal, termination of all visitation would be appropriate. The court ultimately agreed, explaining that the children would "probably end up being adopted by [paternal grandparents]." The court seemed to believe that maternal grandparents might as well get a head start on adjusting to the inevitability of adoption by paternal grandparents and learning to live without any contact with the children they dearly loved. Although the court believed the children would benefit from this complete severing of contact with maternal grandparents (in the interest of stability, permanency and certainty), we see nothing in the record indicating that supervised visitation should cease because of the possible adoption in the future.

Maternal grandparents were obviously blindsided by this last-minute decision and the summary manner in which all contact with their beloved grandchildren was abruptly terminated. Maternal grandparents' counsel argued vigorously, exclaiming to the court he was "absolutely beside [him]self" that this decision could be made in this manner. Furthermore, he could not comprehend how an abrupt severance of all contact could possibly be in the children's best interest. Despite the protestations of maternal grandparents' counsel, the court stated it believed maternal grandparents "had a chance to present all the evidence they would want to present." But maternal grandparents were afforded no opportunity to argue or present evidence to rebut county counsel's motion on the specific topic of supervised visitation, which maternal grandparents had assumed would continue at least until the children

were adopted. In our opinion, the court erred in denying maternal grandparents a full and fair hearing on the issue.

In addition, we stress that adoption by paternal grandparents at this point was *not* a foregone conclusion and the court's termination of all visitation with maternal grandparents for that reason was error. At that point, any number of events could have changed the course of the proceedings (as they still could) and maternal grandparents, excluded from the process by termination of visitation, would no longer be in the best position to participate. This outcome would be detrimental to the children. Finally, we note that neither termination of mother's parental rights nor denial of maternal grandparents' section 388 petition had any effect on maternal grandparents' ongoing status as de facto parents.

Second, the court's order terminating all visitation with maternal grandparents foreordained the outcome in this case by rendering the issue of mediation moot. The order effectively informed paternal grandparents that any effort toward mediation or other forms of cooperation was simply no longer required, or even encouraged. The order eliminated whatever motivation paternal grandparents, who had already proven resistant to visitation requests, might have had to allow visitation for the sake of the children, particularly Mickel, who was so tightly bonded to maternal grandfather. As the expert opined, the optimal outcome for the children included liberal visitation with maternal grandparents, provided the grandparents could work together to create a peaceful and nondisruptive relationship. But all prospects for crafting an improved relationship between the acrimonious grandparents through mediation or other forms of cooperation evaporated upon the court's order.

Moreover, we believe the juvenile court should have actively pursued the prospect of mediation between the grandparents. Although the parties had previously agreed to participate in a "family group decision-making conference," it never occurred, apparently due to animosity between the grandparents or refusal by one or more of the grandparents. Mediation can save both families and court resources, as explained in Justice Dawson's concurrence, and we think the court should have inquired into the reasons why no mediation had occurred and encouraged the parties to reconsider and participate. The evidence plainly established the importance of visitation between Mickel and maternal grandfather, and an effort should have been made to promote that outcome rather than dooming it to failure or acquiescing to its futility.[6]

---

[6] We note that at least one court has held that under certain circumstances the juvenile court maintains the authority to order visitation following adoption. (*In re Hirenia C.* (1993) 18 Cal.App.4th 504 [22 Cal.Rptr.2d 443].)

In our opinion, the decision to terminate visitation exceeded the bounds of reason and thus constituted an abuse of discretion. (See *In re Stephanie M., supra,* 7 Cal.4th at pp. 318–319.) We therefore reverse the juvenile court's order terminating supervised visitation between maternal grandparents and the children. As a result, the previous visitation order is immediately reinstated and maternal grandparents are entitled to prompt resumption of supervised visitation with the children. We also direct the juvenile court to place the matter on calendar for the court and the parties to consider mediation with a view to a possible long-term and/or postadoptive visitation agreement (see Fam. Code, § 8616.5) that allows the children to maintain their relationships with both sets of grandparents, despite any issues remaining between the grandparents. Our concerns and desires in this regard are eloquently stated by Justice Poochigian in his concurring opinion.

Lastly, in light of the allegations of bias and a deteriorated relationship between the social worker(s) and maternal grandparents, we conclude that a new relationship would facilitate the progress of the case. For this reason, we direct the juvenile court to order the agency to assign a new social worker to the case for all purposes, including supervision of visitation. We expect that maternal grandparents will be treated with objectivity and respect by the agency and its agents; conversely, we expect maternal grandparents to finally recognize the potential harm that can come from their comments to the children about returning to maternal grandparents' home. The goal at this point is to reunite the children with maternal grandparents and restore visitation for the good of the children *under the current circumstances.* This goal cannot be met with a strategy that undermines, agitates, or creates animosity and discord. Such a strategy serves only to advance the adult drama at the expense of the children's well-being.

III. *Consideration as Prospective Adoptive Parents*

Maternal grandfather contends the adoption assessment was not conducted in accordance with section 366.21, subdivision (i) because the social worker limited her consideration to parental grandparents who had had custody of the children for over six months. After the agency's reference to section 366.26, subdivision (k), maternal grandfather counters that paternal grandparents did not qualify for preference because a "substantial emotional attachment" was lacking, as evidenced by the expert's bonding study.

We disagree that the bonding study contained no evidence of a substantial emotional attachment between the children and paternal grandparents. "When the sufficiency of the evidence to support a finding or order is challenged on appeal, even where the standard of proof in the trial court is clear and convincing evidence, the reviewing court must determine if there is any

substantial evidence—that is, evidence which is reasonable, credible and of solid value—to support the conclusion of the trier of fact. [Citations.] In making this determination, we recognize that all conflicts are to be resolved in favor of the prevailing party and that issues of fact and credibility are questions for the trier of fact. [Citations.] The reviewing court may not reweigh the evidence when assessing the sufficiency of the evidence. [Citation.]" (*In re Jasmine C.* (1999) 70 Cal.App.4th 71, 75 [82 Cal.Rptr.2d 493].)

Although the evidence established that Mickel's strongest attachment was with maternal grandfather, there was evidence that the children had formed substantial emotional attachments to paternal grandparents. The expert stated that Mickel felt most secure in paternal grandparents' home and that the children were attached to paternal grandparents. Mickel relied emotionally on paternal grandmother and desired to establish a warm, nurturing relationship with paternal grandfather. The children were still learning to communicate with paternal grandparents, but they appeared to feel settled and safe at their home and they readily told paternal grandparents they loved them and sought physical closeness with them. The evidence was sufficient to support the juvenile court's finding.

### IV. *Paternal Grandparents' De Facto Parent Status*

Maternal grandfather argues that paternal grandparents should not have been granted de facto parent status because there was evidence that paternal grandmother abused Mallory in the incident reported by Debbie Johnson. Johnson witnessed Mallory crying and running barefoot in the winter far behind paternal grandmother, who was pushing a stroller along a busy street. Eventually, Mallory caught up and got into the stroller. Evidence of this incident was before the juvenile court and it was required to weigh the evidence and judge the credibility of the witnesses; we have no power to do so. (*In re Casey D., supra,* 70 Cal.App.4th at pp. 52–53; *In re Jasmine C., supra,* 70 Cal.App.4th at p. 75.)

### V. *Ineffective Assistance by Children's Counsel*

Maternal grandfather explains that children's counsel was ineffective because he failed to meet with the children to determine their wishes, as required by section 317, subdivision (e), and consistently agreed with the agency, thereby failing to advocate for the children and revealing his bias. As a result, maternal grandfather asserts, the juvenile court could not consider the children's wishes because they were not made known by children's counsel, and thus the court failed to act in the best interests of the children.

" 'To establish ineffective assistance of counsel, [maternal grandfather] must demonstrate that (1) counsel's representation was deficient in

falling below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation subjected [maternal grandfather] to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to [maternal grandfather]. [Citations.]' " (*In re Jones* (1996) 13 Cal.4th 552, 561 [54 Cal.Rptr.2d 52, 917 P.2d 1175]; see *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 104 S.Ct. 2052]; *In re Emilye A.* (1992) 9 Cal.App.4th 1695, 1711 [12 Cal.Rptr.2d 294].)

Assuming that children's counsel failed to competently represent the children's interests by failing to meet with them and by siding with the agency, we cannot say maternal grandfather has shown that the outcome would have been different had counsel performed competently. The expert impartially reported the children's wishes. For example, she recognized that Mickel wanted to go "home" to maternal grandparents' home, but that he hated the strife he had witnessed there and liked the stability of paternal grandparents' home. Mallory was too young to voice her opinions, but she was becoming particularly attached to paternal grandfather. Under these circumstances, we believe the court received the information it required to properly consider the children's wishes.

## DISPOSITION

The juvenile court's order terminating maternal grandparents' supervised visitation with the children is reversed. The matter is remanded to the juvenile court with directions to immediately reinstate the previous visitation order, to order the agency to assign the case to a new social worker, and to set the matter on calendar for a hearing during which the court and the parties will consider mediation and the prospects for a visitation agreement to promote the children's best interests in maintaining relationships with both sets of grandparents. In all other respects, the juvenile court's orders are affirmed.

Dawson, Acting P. J., and Poochigian, J., concurred.

**DAWSON, Acting P. J.,** Concurring.—On May 22, 2008, the trial court entered its order for a bonding study to examine the nature of the bonds between the minors, Mickel O. and Mallory P., and their four grandparents. On the same date, pursuant to the grandparents' agreement, the trial court also entered an order that the Merced County Human Services Agency (agency) facilitate a "family group decision-making conference." But no such conference ever occurred. Instead, the agency referred the parties to private

mediation.[1] Yet, for reasons not explained in the record (except through dueling accusations), nothing came either of this referral to mediation or of the grandparents' request for a group decisionmaking conference.

Approximately two years and 19 hearings later, the trial court abandoned all efforts to encourage a settlement between the grandparents and peremptorily excluded the maternal grandparents from any part in the children's lives. I agree with my colleagues that this was error.

I write to encourage the superior courts to heed the words of the California Legislature in Welfare and Institutions Code section 350, subdivision (a)(2): "Each juvenile court is encouraged to develop a dependency mediation program to provide a problem-solving forum for all interested persons to develop a plan in the best interests of the child, emphasizing family preservation and strengthening. The Legislature finds that mediation of these matters assists the court in resolving conflict, and helps the court to intervene in a constructive manner in those cases where court intervention is necessary." In doing so, I must of course acknowledge that the Legislature has abandoned an initial effort to provide a funding source for court-connected dependency mediation. (See Stats. 1992, ch. 360, § 2, p. 1385, eff. July 24, 1992 [pilot project with funding source]; Stats. 1996, ch. 405, § 2, p. 2654 [temporary two-year funding source]; Stats. 2002, ch. 784, § 517 [dependency mediation programs directed to find funding from "ancillary funding sources"].)[2] This loss of funding, as well as chronic budget woes, has no doubt contributed to the dearth of functioning programs. I would encourage both the Legislature (to reconsider) and the superior court (to find a way to provide this best practice). Various studies show that dependency mediation conserves the dependency court's resources and serves the best interests of dependent children.[3] Certainly the present case is a glaring example of how mediation—

---

[1] Merced, like many other counties in the State of California, has no court-connected dependency mediation program. As of 2002, only 21 counties in the state provided dependency mediation, although such programs have long been identified as a "best practice" in child protection cases. (Edwards, *Mediation in Child Protection Cases* (AOC 2004) 5 J. Center for Fams., Child. & Cts. 57, 63 & fn. 39.)

[2] The funding source used and then abandoned was a surcharge of up to $3, approved by the county board of supervisors, for certified copies of birth certificates.

[3] Retired Judge of the Superior Court of Santa Clara Leonard Edwards, who currently serves in the California Administrative Office of the Courts, Center for Families, Children and the Courts as a judge-in-residence, has written at least three articles extolling the virtues of dependency mediation. (Edwards, *Mediation in Child Protection Cases, supra,* 5 J. Center for Fams., Child. & Cts. at pp. 57–70; Edwards et al., *Mediation in Juvenile Dependency Court: Multiple Perspectives* (Fall 2002, No. 4) 53 Juv. & Fam. Ct. J. 49; Edwards, *The Juvenile Court Corner* (Summer 2008, No. 2) 48 The Bench 9.) He states that, "in the Santa Clara County court, 75 percent of the cases referred to mediation resulted in complete resolution of all issues, 17 percent resulted in resolution of part of the issues, and only 8 percent did not have resolution of any issue." (Edwards, *Mediation in Child Protection Cases, supra,* at p. 63.)

admittedly, if it was successful—could have saved many hours of court time and the resources consumed during those hours. It also, if successful, could have greatly relieved the stress suffered by these children and their extended family.

With these comments added, I join in the decision announced in the majority opinion.

**POOCHIGIAN, J.,** Concurring.—I concur in the majority opinion. I write separately to express my perspective about the circumstances in this case that must be examined in the context of a prescriptive, complex statutory scheme intended to achieve some level of stability for children in distress.

As the nature of family life continues to change in our culture—including parental absence and social pathologies that can do great harm to children— our legal system is constantly faced with the challenge of discerning and applying the law in a manner that is true to legislative intent and in the best interest of the children involved. Unlike so many causes where fashioning rules of conduct, managing behavior, and resolving conflicts are a rather straightforward, logical exercise with a foundation in the experience and wisdom of the ages, the development of dependency laws has undergone great change in the past few decades to meet the needs of children growing up in an environment that bears little resemblance to the television families of the '50's and '60's.

When dealing with the frailties of the most basic and important societal unit, the law that grapples with its failure is abstruse. Judgments that are made in this field can have the most profound effect on the lives of young people at the most fragile stage of their development. As the juvenile court weighs the factors that it must consider, its determinations necessarily involve critical input from professionals charged with the responsibility of evaluating the strengths and weaknesses of the parties involved and making reasoned recommendations in the best interest of the children.

Our expansive Family Code and Welfare and Institutions Code offer a scheme for application of rules whereby the fitness of custodial and prospective custodial parties is measured, with due deference to generally strict deadlines that are intended, in part, to achieve a permanent and stable living arrangement.

---

He also cites numerous studies demonstrating the substantive and economic success of dependency mediation. (See, e.g., *id.* at p. 63, fns. 42–44.)

The Third District Court of Appeal once observed in another context: "Our system of appellate review is grounded in common sense and the real world. Trial court proceedings are imperfect, as are appellate proceedings. This is not to say close is good enough. We merely observe we always deal with all the errors and imperfections, conscientiously and cautiously, to determine whether a miscarriage of justice has occurred. [Citation.] If it has, we reverse. If it has not, we affirm." (*People v. Coley* (1997) 52 Cal.App.4th 964, 969 [60 Cal.Rptr.2d 870].)

*In re Mickel O.* presents us with a most difficult example of the challenges that are faced by appellate courts in many dependency matters. We are charged with the responsibility of determining whether the juvenile court abused its discretion when it decided not to change the children's placement from one set of grandparents to the other set of grandparents and to terminate visitation with the maternal grandparents. The court's decisions could substantially impact the ultimate placement of the children. One set of grandparents is competing with the other—each hoping to prove that the other is less fit for service. The easy cases are those in which some miscreant behavior, lack of responsibility, or other manifest shortcoming leads to an obvious choice. This is not such a case.

Case law dealing with dependency issues often involves struggle between quarreling parents and stepparents, or parents and grandparents. In the instant case, we are well past time for consideration of the parents' role. That task is complete. We are faced here with a rather unusual situation in which paternal and maternal grandparents, each of whom have had significant contact at various times with the affected children, are very contentious over visitation rights and generally disagreeable toward one another.[1] Making the decision of the juvenile court—and, in turn, our court on appeal—particularly difficult is the fact that there are significant conflicting observations concerning the relationships between the children and each of their four grandparents, as well as questions raised about whether one set of grandparents may have been unfairly disfavored by the reviewing agency such that, under the applicable statutory scheme, the ultimate outcome may seem preordained.

---

[1] "Grandparents' rights to court-ordered visitation with their grandchildren are purely statutory. [Citation.]" (*In re Marriage of Harris* (2004) 34 Cal.4th 210, 219 [17 Cal.Rptr.3d 842, 96 P.3d 141]; see Welf. & Inst. Code, § 361.2, subd. (h) [where the court has ordered removal of the child from parental custody, the court shall consider whether the family ties and best interest of the child will be served by granting visitation rights to the child's grandparents]; Welf. & Inst. Code, § 16507, subd. (a) [family reunification services shall include a plan for visitation of the child by his or her grandparents, where the visitation is in the best interests of the child and will serve to maintain and strengthen the family relationships of the child]; see also Fam. Code, §§ 3102, 3103, 3104.)

The circumstances—including current placement of the children—may be viewed as likely to result in adoption by the paternal grandparents. While the inane level of acrimony between the competing grandparents and the way the parties were evaluated is somewhat discomfiting, the juvenile court made a decision based upon the evidence and professional recommendation before it.

However, in consideration of the love and affection between the children and their maternal grandparents, my concern is that the discretion exercised in the instant case would lead to the virtually inevitable result that the children may never see their maternal grandparents again. It is because of the importance of averting such an eventuality that I favor the course taken in the opinion herein.

Given the acrimony between the grandparents, there is serious doubt that every reasonable effort was made to encourage meaningful participation in counseling and mediation (with the parties bearing the cost if services are not routinely available through the court) and to provide a clear message to the parties that in making the ultimate placement and adoption decisions, the fitness of the parties would be weighed in the context of their appreciation for the value of nurturing in the children a positive relationship with their grandparents.

The paternal grandparents have expressed some willingness to reach an accord with the maternal grandparents to obtain some appropriate level of visitation in the future. One way of ensuring such occurrence would be to inform the parties of the possibility of entering into a "Postadoption Contact Agreement," pursuant to Family Code section 8616.5, which expresses legislative findings that some adoptive children might benefit from contact with birth relatives and provides a statutory scheme for such agreements. "[T]he opportunity remains, at least before entry of a final adoption decree, for the parties to avail themselves of the provisions permitting a [postadoption contact agreement] and to make the agreement a part of the petition for adoption. If the parties were previously unaware of this law, that must no longer be true." (*In re Zachary D.* (1999) 70 Cal.App.4th 1392, 1398 [83 Cal.Rptr.2d 407].)[2]

---

[2] *In re Zachary D., supra,* 70 Cal.App.4th at pages 1394–1398, cited Family Code former section 8714.7, which dealt with "kinship adoption agreements." Effective January 2001, the Legislature amended the statute and substituted "postadoption contact agreement" for "kinship adoption agreement" throughout. (Stats. 2000, ch. 930, § 3, p. 6950.) In 2003, the Legislature renumbered the statute as Family Code section 8616.5. (Stats. 2003, ch. 251, § 8, p. 2364; see also *In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1394 & fn. 18 [105 Cal.Rptr.3d 521].)

In light of this court's opinion, it is my hope that in the exercise of its discretion, the juvenile court on remand will be able to facilitate an outcome—through a process of counseling and agreement between the grandparents for some meaningful level of visitation—that preserves the relationship between the children and their grandparents who express and demonstrate care and concern for them.