Filed 4/29/14  In re I.B. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re I.B., a Person Coming Under the Juvenile Court Law. | B251892 (Los Angeles County Super. Ct. No. CK81890) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAVID B.,<br><br>    Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Tony L. Richardson, Judge. Affirmed.

Orren & Orren and Tyna Thall Orren, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Jessica S. Mitchell, Deputy County Counsel for Plaintiff and Respondent.

# I. INTRODUCTION

The father, David B., appeals from orders denying his petition under Welfare and Institutions Code[1] section 388 and terminating his parental rights under section 366.26. The father argues the trial court abused its discretion in denying his section 388 petition because it failed to consider his strong developing bond with his daughter, I.B., the child. We affirm the orders denying the father's section 388 petition and terminating his parental rights.

# II. PROCEDURAL HISTORY

On April 16, 2010, the Los Angeles County Department of Children and Family Services (the department) filed a petition on behalf of the child after she tested positive for amphetamines at birth. The petition alleges the mother, Trina B., tested positive for amphetamine, methamphetamine and marijuana at the child's birth. The mother had a 13-year history of illicit drug abuse and currently used amphetamine, methamphetamine and marijuana. The petition alleges the father had a history of illicit drug use and currently used marijuana. At the detention hearing, the juvenile court released the child to the father.

On May 10, 2010, the department filed a first amended petition. The first amended petition added an allegation concerning the mother's failure to reunify with the child's older half-siblings, Joseph V. and I.Y. The maternal grandfather, Joseph B., and the maternal step-grandmother, Shawna B., became legal guardians of the mother's two older children.

On July 14, 2010, the juvenile court found the child was a dependent under section 300, subdivision (b). The juvenile court sustained the allegations in counts b-1, b-2, and b-4. The juvenile court found true that: the child was born with a positive toxicology

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

screen because of the mother's illicit drug use; the father failed to protect the child when he knew of the mother's drug use; the mother had a nine-year history of illicit drug abuse and was a current user of amphetamine, methamphetamine and marijuana; the mother used drugs during the pregnancy with the child; the mother tested positive for amphetamine, methamphetamine and marijuana at the birth; and the mother failed to reunify with the child's half-siblings, Joseph V. and I.Y., in Arizona. The child was placed with the father. The department was ordered to provide the father with family maintenance services and the mother with family reunification services. The father was ordered to attended parent education classes and an Alcoholics Anonymous, Narcotics Anonymous, Al-Anon or an equivalent program.

On January 7, 2011, the department filed a section 387 supplemental petition. The petition alleges the father was unable to provide care and supervision of the child because of his incarceration. The father left the child with an unrelated adult male who failed to undergo a live scan. In addition, the father failed to regularly participate in court-ordered family preservation services including: counseling; parental education; Al-Anon, Narcotics Anonymous or Alcoholics Anonymous meetings; and random drug testing. On April 26, 2011, the juvenile court sustained the section 387 petition and removed the child from the father's custody. The father was granted family reunification services. On August 15, 2012, the juvenile court found the father was in partial compliance with the case plan. The father's family reunification services were extended to January 10, 2013. On February 25, 2013, the juvenile court terminated the father's family reunification services.

On June 19, 2013, the father filed a section 388 petition. The father sought custody of the child, or in the alternative, reinstatement of reunification services including unmonitored, weekend and overnight visits. The juvenile court denied the section 388 petition at the October 1, 2013 hearing. In addition, the juvenile court terminated the father and mother's parental rights. The father filed a notice of appeal from the denial of his section 388 petition and the order terminating his parental rights on October 1, 2013.

3

## III. EVIDENCE

### A. April 16, 2010 Detention Report

In April 2010, the child was born testing positive for methamphetamine. The mother tested positive for methamphetamine and marijuana at the time of the child's birth. The father stated the mother used methamphetamine and marijuana to manage pain from lupus. The father reported the mother used drugs throughout her pregnancy and ignored his pleas for her to stop. The mother had lost custody of her two older children because of her narcotics use but she denied having a drug problem. The mother stated the two older children were in the care of the maternal grandparents because there were really good schools near her parents' home. The mother denied testing positive for drugs and stated she did not have a substance abuse history.

The maternal grandfather, Joseph B., stated he lived in Arizona. He had been the legal guardian of the mother's two older children for the last nine years. The mother had a methamphetamine addiction and the Arizona Child Protective Services became involved when her son, Joseph V., was nine months old. The mother's second child, I.Y., was in the maternal grandfather's custody since she was six days old. The maternal grandfather stated the mother made no efforts to complete the case plan to reunify with the two older children. The maternal grandfather could have adopted the children but chose permanent guardianship because he hoped the mother would reunify with the children. The maternal step-grandmother expressed concerns about the mother's history of drug use. The mother's family had tried to get her to complete a drug treatment program since she was 13 years old.

### B. May 10, 2010 Jurisdiction/Disposition Report

The jurisdiction and disposition report indicated the father had an extensive criminal history extending from 1994 for grand theft auto, robbery, and possession of

4

burglary tools.  The father reported he was incarcerated for armed robbery for five years. He stated he was in a gang and used to steal cars when he was a teenager.  But the father had changed his life and had not been in trouble with the law for seven or eight years now.  Children's social worker Lydia Laza recommended the child be declared a dependent of the juvenile court.  In addition, Ms. Laza recommended the child remain in the father's home with him receiving family maintenance services.

### C.  Detention Report For The Section 387 Petition

The January 7, 2011 report indicated the father was arrested for a misdemeanor on December 25, 2010 and released three days later.  On January 4, 2011, the paternal grandmother, Patricia B., reported the father was arrested once again.  The Los Angeles County Sheriff's Department reported the father was arrested for deadly weapon assault on January 2, 2011.  The paternal grandmother stated the father dropped the child off with a friend, Hector Gonzalez.  Children's social worker Teresa Voettiner could not assess Mr. Gonzalez's ability to care for the child and his criminal background, if any, because he had not submitted to a live scan with the department.  The father was aware anyone caring for the child needed to submit to a live scan examination.  In addition, the father failed to contact Ms. Voettiner regarding his arrest or the child's whereabouts.  Ms. Voettiner recommended the child be removed from the father's custody and he receive family reunification services.

### D.  January 12, 2011 Status Review Report

The status review report stated the father was arrested for deadly weapon assault. The father allegedly was involved in a physical altercation with an ex-girlfriend.  He hit the ex-girlfriend repeatedly in the face and kicked her several times in the stomach leaving marks, bruises and lacerations on various parts of her body.  The father was currently in the custody of the San Mateo County Sheriff's Department.

5

### E. Jurisdiction And Disposition Report For Section 387 Petition

The March 3, 2011 report indicated the father was incarcerated and unable to provide the child with care and supervision. The father had attended some Al-Anon meetings but his attendance was sporadic. In addition, the father had yet to enroll in parenting classes. The father had received family preservation services but was discharge from the program after he missed three consecutive weekly visits. The report stated the father remained incarcerated in a San Mateo County correctional facility. The social worker was unable to interview the father because the facility did not permit telephone interviews.

### F. April 25, 2012 Status Review Report

The status review report stated the child was placed with the maternal grandparents, Joseph and Shawna, on December 21, 2011, in Arizona. The child interacted well with her older half-siblings who also lived with the maternal grandparents. The child was participating in regional center services to enhance her speech. The child appeared comfortable, healthy and well-cared for in the maternal grandparents' home. There were no safety concerns and the maternal grandparents were attentive to the child's needs.

The report indicated the father was sentenced to three years but had an early release date of December 16, 2012. Ms. Voettiner, the social worker, sent a letter to the father notifying him of the programs offered at Avenal State Prison. The father responded and indicated he was on the waiting list to attend parenting classes, anger management, and 12-step meetings. The father was not visiting the child because he remained incarcerated in state prison in California.

Ms. Voettiner recommended the juvenile court terminate the father's family reunification services. She reported the father had participated in parenting and domestic

violence classes while in prison but she did not know his progress. In addition, when the father was released from prison, he would have exceeded his reunification time. Also, the father had not complied with his case plan in the past and was dishonest about his arrest. Ms. Voettiner stated it was crucial for the child to reside in a stable environment, which the maternal grandparents were providing for her. The maternal grandparents indicated they were willing to provide the child with a more permanent home with her three other half-siblings.

### G. August 15, 2012 Interim Review Report

The father reported he had completed a 6-week domestic violence course, parenting classes and was participating in 12-step meetings while in prison. The father was incarcerated when the child was 8 months old and had been out of her life for 18 months. The child was now two years old. The father called three times per week to speak with the child. The calls did not last long because the child would throw the phone down after only a few minutes of talking with the father.

### H. January 10, 2013 Status Review Report

The father was released from prison on December 16, 2012. The father met with Ms. Voettiner, the social worker, the day after his release. The father denied the incident surrounding his arrest and conviction. The father reported he had completed anger management, domestic violence and parenting classes while in prison. He stated he was willing to participate in any programs in order to have the child returned to his care.

The father called the child often but she was unable to communicate because of her age and speech delays. The father was scheduled to have a monitored visit with the child for two hours on January 9, 2013, at the social worker's office. The child interacted well with her half-siblings and peers and was sociable. She enjoyed dancing to music,

was able to count to 12, and was beginning to color and draw.  The child received speech and occupational therapy from the early intervention program.

## I.  Section 366.26 Report

The report stated the child continued to thrive in the home of her maternal grandparents, the prospective adoptive parents.  The maternal grandparents were committed to the concurrent plan of adoption and had adopted the child's other half-siblings.  The department recommended termination of parental rights so the child could be adopted by the maternal grandparents.  Arizona required parental rights be terminated before it would conduct an adoption home study.

## J.  August 26, 2013 Status Report For Section 388 Petition Hearing

The report stated the child, now three, was thriving in her maternal grandparents' care.  She appeared "'happy, comfortable, healthy and well-cared for'" in their home.  The child "'bonded with her grandparents'" and went to them for comfort.  The maternal grandparents were very attentive to the child's needs and were committed to caring for her.

The report stated at the onset of the case, the father made limited progress in completing the case plan goals.  When the child was in his care, he did not enroll in court-ordered services including parenting classes and Alcoholics Anonymous meetings.  He voluntarily participated in family preservation services but was discharged because he failed to attend required weekly meetings.  While the father was in prison, he participated in parenting, 100 hours of domestic violence and anger management classes.

However, Ms. Voettiner was concerned about the father's parenting abilities because he had unrealistic expectations about the child given she was only three.  During the Skype visits, the father sometimes would become upset with the child and discipline her inappropriately.  During one Skype visit, the father saw the child pick her nose and

8

tried to reprimand her. He raised his voice and told the child she was "'yucky.'" The father then told the child to sit on her hands. When she refused, the father stated, "'You better listen to daddy.'" The child began to cry hysterically and would not calm down so the visit was cancelled. During another Skype visit, the father became upset with the child for calling him "'funny guy'" instead of "daddy." When the child refused to call him "daddy," the father raised his voice and stated, "'[I]f you love me you will call me daddy.'" The child became upset and began crying so the Skype visit was terminated. During another Skype visit, the father saw the child move around in her chair and swinging her arms. He got upset and raising his voice, asked the child, "'Who taught you how to punch?'" The maternal step-grandmother informed the father the child was not punching but was dancing in her seat. The father continued to question the child, asking her "'[W]ho is teaching you to be mean?'" When the child did not respond, the father called her a "'bad girl'" and a "'mean girl.'" The child began to cry uncontrollably and the visit had to be terminated. During the Skype calls, the child rarely responded to the father and sat quietly. The father repeatedly asked the child the same questions and when she did not respond, he would ask her if she was upset with him. The Skype visits did not last long because the child refused to sit during the entire visit and would get up and leave the room.

The father's two in-person visits went better than the Skype visits. But the monthly in-person visits were infrequent because the father could not travel outside of California. At the beginning of the visits, the child would cling to the maternal grandparents. But by the end of the visits, the child became comfortable enough to hug the father. The father was attentive to the child's needs and interacted appropriately with her by bringing toys and games to the visits.

### K. September 23, 2013 Last Minute Information For The Court

The report stated the maternal step-grandmother brought the child to a Chuck E. Cheese restaurant in Norwalk, California for an in-person visit with the father. The father

arrived on time for the visit and was affectionate and appropriate with the child. But the child was reluctant to interact with the father at the start of the visit. Once the child became more comfortable with the father, she talked to him about the games they were playing and preschool.

The father continued to have Skype visits with the child three times per week. He failed to show up for the Skype visits on three occasions. The father reported it was difficult for him to make it home in time for Skype visits on his computer because of work. The child was adjusting to the Skype visits and now was able to sit for 15-minute sessions. Previously, the child was only able to have five-minute Skype sessions. The father interacted with the child over Skype by reading her books and showing her stuffed animals. However, there were still concerns about the father's interactions with the child. On one Skype visit, the father asked the child if she knew who he was. The child responded, "'[Y]ou're not daddy, you're nothing.'" The father insisted he was "daddy" and questioned the child as to who told her he was not her father. The father repeatedly asked the child if she wanted to see him again and she responded by saying, "'no.'" After the Skype visit, the father called the maternal step-grandmother because he was upset the child referred to the maternal grandfather as "daddy." The child called the maternal grandfather "daddy" because her three half-siblings referred to the maternal grandparents as "mommy" and "daddy."

The maternal step-grandmother reported the child had difficulty sleeping at night because she feared being taken from home. At times, the child would wake up during the night crying and say, "'no go, I want to stay here'" or "'no go with funny guy.'" This usually occurred following Skype visits where the father pushed the child to call him "daddy" or when visits did not go well.

## L. Testimony During Section 388 Petition Hearing

The father testified he was released from prison on December 16, 2012, where he was incarcerated for 18 months. While in prison, he completed: family counseling; self-

help programs; and anger management, parenting and domestic violence classes. Also, he attended Alcoholics and Narcotics Anonymous meetings. But the father was currently reworking the 12 steps. He was on step one and was working on the step without a sponsor. During his incarceration, the father had phone contact with the child while she was residing in California. When the child was placed in Arizona, the father contacted her by mail sending letters and cards to the child's social worker. The child was only nine months old when the father went to state prison.

The father testified he had four in-person visits with the child in California after his release from prison. The father stated at the most recent visit in Blythe, California, he and child played in a McDonald's playground. He reported the child giggled, gave him kisses and said she loved him. He stated the in-person visits went better than the Skype calls. The father admitted the child was distracted easily and ended visits early during the Skype sessions. He denied ever getting mad at the child during the Skype visits. The father acknowledged the child called him "'the funny guy'" during the Skype visits.

The maternal step-grandmother testified she was present during all the Skype visits between the father and the child. She stated the father raised his voice many times during the Skype visits. Most recently, on July 1, 2013, the father got upset with the child after he saw her swinging her arms around. He raised his voice, which made the child very upset. The child began to cry so the maternal grandfather took her out of the room. The maternal step-grandmother stated: "After that when she got on Skype for like the next three weeks on all the Skype visits, she would just sit back in her chair, and she didn't want to Skype. She would refuse. When I'd go to put up Skype, she would tell me, 'No, Skype, Mommy. No Skype.'"

## IV. DISCUSSION

### A. Section 388 Petition

Section 388, subdivision (a)(1) states in part: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." A litigant requesting modification under section 388 has the burden of proving by a preponderance of the evidence that the child's welfare requires such change. (Cal. Rules of Court, rule 5.570(h)(1)(C); *In re A.A.* (2012) 203 Cal.App.4th 597, 612; *In re B.D.* (2008) 159 Cal.App.4th 1218, 1228.) The moving party must show changed, not changing, circumstances. (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) In addition, new evidence or change in circumstances must be of such significant nature that it requires modification of the challenged order. (*In re A.A., supra,* 203 Cal.App.4th at p. 612; *In re Mickel O., supra,* 197 Cal.App.4th at p. 615.) We review an order denying a petition under section 388 for an abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re A.A., supra,* 203 Cal.App.4th at p. 612.)

The father argues the trial court abused its discretion in denying his section 388 petition. He admits his imprisonment and subsequent probation were consequences of his own conduct leading to termination of his reunification services. But the father contends he was developing a strong bond with the child which should have been considered by the juvenile court.

The juvenile court did not abuse its discretion in denying the section 388 petition. The father failed to show change in circumstances requiring modification of the reunification services termination order. The Skype visits between the father and child lasted from 5 to 15 minutes. Some Skype sessions ended early because the child became upset after the father raised his voice. The maternal step-grandmother testified the child

12

did not want to participate in the video visits for three weeks after the July 1, 2013 Skype session. Moreover, the father did not establish a bond with the child. The child was only eight months old when the father went to state prison. He was unable to have in-person visits with her during the 18 months he was in prison. The child called the father "'the funny guy.'" Sometimes, the child had difficulty sleeping at night because she feared being taken from home. At times, the child would wake up during the night crying and say, "'no go, I want to stay here'" or "'no go with funny guy.'" While the four in-person visits went better than the Skype visits, the child had to be encouraged by the maternal step-grandmother to interact with the father at the start of the visits.

Also, the father failed to demonstrate that it would be in the child's best interest for him to have more reunification services. The child was now 3 years old and the father had been out of her life for 18 months. The child was doing well in her pre-adoptive home with her half-siblings and maternal grandparents. She was thriving in her maternal grandparents' care and appeared "'happy, comfortable, healthy and well-cared for.'" The child "'bonded with her grandparents'" and went to them for comfort. The maternal grandparents were very attentive to the child's needs and were committed to caring for and adopting her. The juvenile court did not abuse its discretion in denying the section 388 petition.

The father also appeals termination of his parental rights but raises no arguments separate from his challenge of the denial of his section 388 petition. Accordingly, the order terminating the father's parental rights must be affirmed. Any contention concerning the termination of parental rights apart from the modification petition has been forfeited. (*Tiernan v. Trustees of Cal. State University and Colleges* (1982) 33 Cal.3d 211, 216, fn. 4; *Johnston v. Board of Supervisors* (1947) 31 Cal.2d 66, 70, disapproved on another point in *Bailey v. County of Los Angeles* (1956) 46 Cal.2d 132, 139.)

13

## V. DISPOSITION

The orders denying the father's section 388 petition and terminating his parental rights are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P. J.

We concur:

MOSK, J.

MINK, J.[*]

---

[*] Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.