Filed 5/14/14  R.M. v. Super. Ct. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| R.M.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>        Respondent;<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES et al.,<br><br>        Real Parties in Interest. | No. B251998<br><br>(Los Angeles County Super. Ct. No. CK42835) |

ORIGINAL PROCEEDINGS in mandate.  S. Patricia Spear, Judge.  Petition denied.

Rich Pfeiffer for Petitioner.

No appearance for Respondent.

Amir Pichvai for Real Party in Interest Los Angeles County Department of Children and Family Services.

Children's Law Center and Charles Aghoian for Real Parties in Interest L.P. and E.P.

Mother R.M. petitions for writ of mandate challenging juvenile court orders declining to return her twin daughters to her custody and terminating reunification services on a finding that reasonable services had been provided. She contends that she was not provided reasonable reunification services, the social worker for the Department of Children and Family Services (the department) on the case was biased and should have been removed, the therapist for the twins had a conflict of interest, and the court erred in denying her request for a bonding study. Mother asks us to vacate the orders of the juvenile court and order the twins returned to her care, or alternatively, to order additional reunification services. She also asks that we order a bonding study between the siblings to be completed before a permanency planning hearing is held under Welfare and Institutions Code section 366.26.[1] Although Mother seeks an order for conjoint counseling between the siblings to maintain their bond prior to the section 366.26 hearing, she provides no argument or authority in support of that request, which is therefore forfeited.

We find substantial evidence supporting the order terminating reunification services and no abuse of discretion in refusing to extend services further. The juvenile court acted within its authority in declining to remove the social worker. The record does not establish a disqualifying bias on the part of the therapist for the twins. Mother was given ample opportunity to vigorously examine both the social worker and the therapist about the claims of bias. We find no abuse of discretion in denial of the request for a bonding study.

## FACTUAL AND PROCEDURAL SUMMARY

This case was before us previously on an appeal from jurisdiction and disposition orders of the court. We affirmed the trial court orders in that case. (*In re Paul M.* (Jan. 30, 2013, B240325 [nonpub. opn.] (*Paul M. I*).) We take a portion of the factual and procedural history from our opinion in *Paul M. I.*

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

Mother's children are Paul M. (born May 1999) and L.P. and E.P., twin girls (born December 2006).  The family has a history with the dependency system, including 22 child protection hotline referrals over the past 13 years, most of which were determined to be inconclusive or unfounded.  Paul was temporarily removed from the home in 2000, when police officers found him alone and asleep in his infant car seat with no adults present.  This report gave rise to a previous dependency proceeding.  (*Paul M. I*, pp. 2–3.)

In May 2011, a referral was made to the department due to concern that Paul had unaddressed mental health issues and was possibly subjected to sexual abuse, based on evidence of his use of inappropriate sexual language and inappropriate sexual behavior.  When a social worker went to mother's home to interview her and the children, the twins reported being hit by both Paul and appellant with various objects, including a hand, a shoe, and a belt.  They also stated that Paul had touched their "private parts" and that he made them "eat it."  Mother denied any inappropriate physical or sexual contact.  The social worker returned the next day and the twins again detailed sexual contact with their brother, adding that mother told them not to talk about it.  (*Paul M. I*, at p. 2.)

All three children were detained and removed from mother's home.  A dependency petition was filed by the department under section 300.  The first amended dependency petition alleged each of the children came within the jurisdiction of the juvenile court under section 300, subdivisions (a), (b), (d), and (j).  In preparation for the department's jurisdiction/disposition report, a dependency investigator interviewed the twins, who again reported that mother hit them with various objects and directed Paul to hit them as well.  They also discussed sexual contact with Paul, but vacillated about the details.  Mother admitted hitting all three children with various objects and having Paul spank the twins for her.  She continued to deny there was any problem with the children, deflecting blame to others.  (*Paul M. I*, at p. 3.)

The director of an after-school synagogue program Paul attended, and the assistant principal at his middle school, each reported that Paul had serious behavior issues, including the use of inappropriate sexual language and inappropriate sexual behavior.  Mother was unwilling to acknowledge Paul had any problem when these issues were

3

brought to her attention by both administrators. (*Paul M. I*, at p. 3.) A supplemental report for the jurisdiction/disposition hearing stated that the twins had again told a social worker about sexual contact with Paul, providing additional details. Mother's visits with the children were so inappropriate that she was given written guidelines for future visits. She often reacted in a threatening, aggressive, defensive or combative manner, leading the department to conclude she had undiagnosed mental health issues which impeded her ability to appropriately interact with the children. (*Ibid.*)

Mother repeatedly sought to represent herself in the dependency proceedings. She was eventually allowed to do so, and was instructed about her rights to call and cross-examine witnesses, or to submit declarations. She provided declarations for the jurisdiction/disposition hearing and stated that she planned to submit on the declarations and reports alone. But just before the court announced its jurisdictional finding, mother objected that there were no witnesses and stated her wish to cross-examine declarants identified in the department's reports. The objection was overruled because mother had taken the position that she would submit on the reports and declarations only. (*Paul M. I*, pp. 4–5.)

The court amended some of the allegations in the petition, struck others, and sustained the petition as amended. It declared the children dependents of the court and ordered them to remain in the department's custody. It also ordered that mother's visits be monitored and that she undergo a psychological assessment. (*Paul M. I*, p. 5.) Mother appealed from the jurisdiction and disposition orders, claiming denial of her right to due process and insufficient evidence to support the orders. We affirmed the court's orders in *Paul M. I*. (*Paul M. I*, p. 11.)

Mother filed a walk-on request on August 20, 2012, which was construed by the court as a section 388 petition. She stated that she had complied with court orders and had enrolled the children in school beginning August 22, 2012. The court heard the petition and held a review hearing under section 361.21, subdivision (e). Mother requested a contested hearing. Since the children had been in foster care for 13 months, the court explained to mother that the appropriate review hearing was a 12-month review

4

under section 366.21, subdivision (f). The matter was set for a contested section 366.21, subdivision (f) review hearing.

The contested 12-month review hearing began on December 7, 2012, before Judge Mark A. Borenstein. Kendall Evans, a marriage and family therapist for mother, testified. In February 2013, a new attorney substituted in for mother, forcing a lengthy continuance of the 12-month review hearing to April 18, 2013. In light of the delay, the matter was set for combined contested 12 and 18-month reviews under sections 366.21, subdivision (f) and 366.22. That hearing was continued at the department's request. In April, the court ordered a conjoint counseling assessment to be included in the 18-month review report.

The department prepared a report for the next hearing, set for May 23, 2013. It stated that mother had refused visits with the twins because of her disagreements with the department. She had pursued complaints within the department and with the Board of Supervisors. Mother had participated in a mental health assessment by Dr. Bangston in the prior dependency matter involving only Paul. Dr. Bangston concluded that mother did not exhibit signs of a major mental illness or impairment in social functioning. Mother participated in counseling in this case as ordered. Her therapist provided a letter stating that he concurred with Dr. Bangston's previous assessment. Because mother had completed only seven sessions, the department recommended additional therapy to develop mother's parenting skills to ensure the twins' safety and Paul's appropriate development and sexual health. Mother agreed to additional counseling. She enrolled at the Southern California Counseling Center for therapy in late April 2013.

Mother resumed weekly visits with Paul and the twins in March 2013, which were successful. Mother was appropriate, caring and loving. She was able to deal with various monitors, which was a great stride forward. Since visits had resumed at a department office there had not been a single negative incident. The social worker stated it was clear the children are well bonded with one another, including bonds between Paul and the twins.

5

A team decision making (T.D.M.) meeting was held on May 2, 2013 to discuss Paul's group home, counseling, and a therapeutic plan to bridge individual therapy for the children to an inclusive form of therapy and counseling. A phased-out plan was agreed to under which Paul would initially receive sexual awareness counseling with Dr. Jared Maloff, followed by conjoint counseling with mother and Dr. Maloff. Eventually, when the twins were ready, they would have conjoint counseling with mother and Paul. Paul also was to have regular therapy with the group home therapist, Ms. Austin. Dr. Lorena Frcek of the Department of Mental Health was to coordinate counseling services and observe monitored visits. Dr. Frcek recommended a current psychological evaluation for mother, who agreed to participate. Mother went to Dr. Mitchell Harris for this purpose. She was steadfast in her desire to reunify with all three children and the children were well-bonded with her. Although Paul's therapist and a staffer from his group home attended the meeting, the girls' therapist, Dr. Catherine Lippincott, was unable to attend because of a scheduling conflict.

Paul continued to have problems at his group home between December 2012 and March 2013, with seven behavioral issue incident reports, one report of danger to self, and three health-related reports. Twenty reports during that period related to incidents arising from mother's provision of kosher food in the home, her negative interaction with staff, and her interference with Paul's compliance at the home. These incidents were decreasing in frequency. Mother had directed Paul not to interact with staff and not to eat food provided at the group home. She made unauthorized appearances at the home, despite the fact that this contact was not allowed. Paul was taken to a hospital twice for refusing food in early February 2013 after he had called 911 four times in the preceding four days about refusing to eat or drink. Paul told a hospital staffer that he would refuse food at the group home until his mother was allowed to bring him food. The Department of Mental Health arranged for him to be hospitalized on a psychiatric hold as a result. About a week later he was discharged to the group home. Paul's behavior at the home had improved, and there had not been a need for further hospitalization. He was going to school and eating the food provided by mother. But he was refusing to participate in

6

services such as therapy. Paul emphatically stated his opposition to being adopted and his desire to return home to mother.

The twins were stable in their foster home and were well-bonded with their mother. They drew pictures for her and shared gifts with her. The girls responded well to mother during visits. The foster parents wanted to adopt the twins.

Mother completed her court ordered parenting class and individual counseling. The department questioned the accuracy of mental evaluations of mother conducted by Evans and Dr. Bangston because they had not been provided with the full case reports and the department had not been involved. It concluded that mother had not benefited from her counseling in light of her continuing behavioral problems as directed toward the department and the group home, and as demonstrated during visits. It cited mother's continued denial that Paul had sexual behavior issues.

Since the deadlines for the provision of reunification services had run, the department recommended termination of reunification services. But it stated that this would be detrimental to Paul's growth and development. The department expressed concern about the lack of progress in therapy by the twins. The therapeutic professionals had failed to consult with one another, but it appeared that the new plan adopted in May 2013 would result in a better understanding of the best interests of the twins and the family as a whole. The department acknowledged the "significant relationship" between the twins and mother. They were bonded with mother and needed an opportunity to participate in a therapeutic process with her. But because of the deadlines for services, the department recommended that reunification services be terminated. It recommended a continuance to consider the results of the current psychological evaluation of mother and Paul's progress in therapy.

In an interim review report for July 12, 2013, the department recounted mother's repeated attempts to discuss the case with the twins at visits, although she had been directed not to do so. When reminded that this was inappropriate, mother argued with the monitor. On one occasion, she brought a large pair of scissors, which was not allowed, to a monitored visit, and began to cut L.P.'s hair. Mother refused to comply with the social

7

worker's request that she stop, and a security guard had to be called to secure the scissors. Beginning in late May 2013, mother refused to discuss any issues with social worker Gerald Wilkins and instead complained to his superiors about his conduct of the case.

Dr. Harris submitted his Evidence Code section 730 evaluation of mother. He met with mother and observed her visit with the children. He reviewed documents she provided, which did not include any of the reports prepared by the department. Dr. Harris concluded that mother did not exhibit signs of severe psychiatric illness. She did not display any signs of obsessionality or other severe anxiety symptoms. The children reacted positively to her and she displayed insight and sensitivity to their needs. In his view, they had a healthy and intact attachment to mother.

The department recommended that future monitored visits take place in a therapeutic setting because of mother's behavior. It recommended termination of reunification services and setting a section 366.26 hearing to implement a permanent plan of adoption for the twins, and a PPLA (planned permanent living arrangement) for Paul.

Mother filed a written request to extend reunification services past the section 366.22 hearing on the ground that she had not received reasonable services. The foster parents for the twins requested de facto parent status in August 2013.

The contested section 366.22 hearing resumed on August 19, 2013 before a new judge, Patricia Spear. The court admitted the department's reports beginning September 2012, records from counseling services, visitation notes, and last minute informations filed with the court. Counsel for mother objected on the ground that social worker Wilkins was biased and did not fairly report the circumstances of the case because of his conflict with mother. He referred to his written motion to remove social worker Wilkins and strike his reports. That motion was opposed by the department and by counsel for the twins.[2] Counsel for the department argued that the separation of powers principle prevented the court from ordering direct removal of a social worker. The court indicated it lacked authority to remove Wilkins, and said that any bias would go to the weight,

_____

[2] The motion and the written oppositions are not in the record on appeal.

8

rather than the admissibility, of Wilkins's statements in the reports. It admitted the reports subject to a motion to strike if actual bias was demonstrated.

The department chose not to call witnesses, relying instead on the exhibits and any cross-examination of witnesses called by other parties. The court heard the testimony of social worker Wilkins, his former supervisor Adrian Hawkins, visitation monitors Chaunte Boyd and Rosita Brennan, therapists Lippincott and Maloff, and evaluator Harris. Mother also testified. The parties stipulated that the court could consider the transcript of Evans' testimony given in December 2012 and January 2013 before a mistrial was declared due to the change in judicial officers presiding over the contested hearing.

Testimony at the contested hearing established that the twins received individual counseling from Dr. Lippincott, but that neither Dr. Lippincott nor anyone from her agency, participated in the May 2, 2013 T.D.M. because they were unavailable that day. Hawkins supervised social worker Wilkins from mid-February to the first week of June 2013. She participated in the May 2, 2013 T.D.M., which was to address counseling and issues at Paul's group home. She testified that conjoint therapy is a typical family reunification order. She felt that conjoint therapy for the twins with mother was in their best interests because family reunification services had been ordered. Her understanding of the plan from the T.D.M. was that therapy with Dr. Maloff, the psychologist hired by mother, was to occur in stages. First, Paul was to have sexual awareness predatory therapy with him. When appropriate, the twins would receive sexual awareness therapy with Dr. Maloff. Later, contingent on appropriate consultations with the clinicians involved, mother and Paul would have conjoint therapy with Dr. Maloff, and eventually, the twins would be included in that therapy. Dr. Frcek, of the Department of Mental Health, was to act as gatekeeper to interact regularly with the professionals treating the family regarding progress of therapy. Unfortunately, Hawkins left the case shortly after these arrangements were made.

Dr. Maloff testified that he had five individual sessions with the twins. His treatment was terminated by Wilkins on June 19, 2013, before he could begin sexual

9

awareness therapy. Wilkins had not contacted him about the twins' progress in therapy up to that point.

As of the contested hearing, Dr. Maloff was still providing individual therapy (including sexual awareness) to Paul. They had had about 15 sessions since therapy began in mid-May 2013. He felt that Paul was making progress. He explained that he approached therapy with Paul as if the sexual abuse had occurred, but that he would see the case in a different light if he was given information confirming the abuse.

Dr. Maloff observed mother during visitations with all three children a total of six times. Their interaction was always positive, with age appropriate behavior with mother. He did not see any sexualized behavior by any of the children, and did not see the twins exhibit fear of mother or Paul. He had no concerns about physical interaction between Paul and his sisters. He did not see any red flags that led him to believe Paul would sexually abuse his sisters or any other person. Dr. Maloff did not have any therapeutic sessions with mother.

Mother complains that the department never arranged for the family to have conjoint therapy in which mother and all three children participated despite the plan at the T.D.M.. She argues that the therapy with Dr. Maloff was terminated because the foster family did not want to drive the twins to his office. Both Hawkins and Dr. Maloff testified that the foster parents complained about the drive to Dr. Maloff's office. Dr. Maloff testified that Wilkins told him his therapy with the twins was being terminated because the department "was going in another direction" and because the girls were traumatized.

Wilkins testified that Dr. Maloff's therapy with the twins was terminated because Dr. Maloff had not communicated with the individual therapist for the twins (Dr. Lippincott) and for Paul (Austin). He did not ask Dr. Lippincott to speak with Dr. Maloff. He never communicated any objection about conjoint therapy to him.

Before terminating the twins' therapy with Dr. Maloff, Wilkins received a telephone call from the foster parents that the girls were terrified that they were going to be taken out of the foster home. He did not talk with the children about this, although he

10

acknowledged that he should have done so to ascertain the feelings of the twins in light of the foster parents' desire to adopt them. But the twins told him they wanted to go home to mother.

Dr. Lippincott did not recommend conjoint therapy between Paul and the twins as of the contested hearing because the twins were unable to tolerate talking about the sexual abuse allegations in therapy. When the issue of sexual abuse was raised with E.P., she reacted by "immediately turning away and hiding her face. . . . [H]er body started to shake. She also immediately said 'I didn't say that, I didn't say that." L.P. would get into a fetal position, and hide under a chair or desk. These behaviors had reduced with therapy, but she still demonstrated a lot of unplanned and incohesive movement due to internal agitation.

Dr. Lippincott also was concerned that mother's adamant denial that Paul had sexually abused the twins would hamper mother's ability to protect them, or allow them to have their own feelings or thoughts. She and other professionals at the UCLA Ties program received multiple, lengthy voice mail messages from mother asserting that the allegations were false, that the therapy methods used in the program were inappropriate, and that Dr. Lippincott was incompetent and was coaching the twins and telling them what to say.

In closing, the department took the position that mother had failed to make any substantive progress on case issues despite completing a number of services and that there was overwhelming evidence that return of the children to mother would create a substantial risk of detriment to them. Counsel for the twins' father agreed with the department's position and supported their adoption by their foster parents. Counsel for the twins recommended that the twins be put on a separate track from Paul because he was so bonded with mother. Counsel for Paul asked the court to return all three children to mother's custody. She argued that reasonable services, such as weekly family preservation services, could be provided to Paul while in mother's home. She also argued for family counseling. Even if the court was not inclined to return the twins,

11

counsel asked for Paul's return to mother and an extension of reunification services to make progress toward conjoint counseling.

Counsel for mother agreed with counsel for Paul and contended that there had been a systematic failure by the department in this case. He argued that mother had complied with the case plan, but that services had not been offered to adequately address the sexual abuse issue. He argued there was no risk of physical abuse by mother, who had learned other parenting techniques. He suggested that Paul be returned to mother with in-home, wrap-around, and family preservation services. He argued a new therapist for the twins was needed because of a conflict arising from Dr. Lippincott's adoption-oriented approach. He accused Wilkins of failure to report evidence positive to mother and failure to perform as required and claimed that as a result, reasonable services had not been provided to mother. Counsel for mother asked that all three children be returned to her custody immediately, saying that mother was willing to comply with in-home services, counseling, or other court-ordered services.

The court denied mother's section 388 petition on the ground that the issues raised within were the same as the issues being litigated in the contested hearing or amounted to an effort to vacate the jurisdiction and disposition orders that were affirmed on appeal. After eleven days of testimony, the court issued its findings and orders on September 20, 2013. It denied mother's motion to remove social worker Wilkins for actual bias, finding no bias despite evidence of conflict between him and mother. It also found that Dr. Lippincott did not have a conflict of interest, although her program at UCLA does work with adoptive children.

The court acknowledged that mother loves her children, but found "nothing has changed." It concluded that mother's obsessive personality required additional therapy, and found that because mother's obsession was focused on some of the allegations, particularly the sexual allegations, the girls could not be safely returned to mother. The court acknowledged the affection the children had for one another and that they did well in monitored visits.

12

As to Paul, the court acknowledged that he wanted to return home to mother and was being warehoused at a group home. The court thought that Paul should not be in a group home, although he was making some progress. It concluded the decision was close, but it was inclined to return Paul to mother on condition that he stay in school and therapy, that mother continue in therapy, and that the department provide T.D.M. or wraparound services in the home. The court indicated a willingness to allow monitored visits for the girls in the home, but declined to return the girls to mother's custody or to extend services. It found that the delays in the case were caused by mother's constant repetition of the same things.

It observed: "I think the services that were provided to the family were not the world's best services, for sure, but they were reasonable services." The court cited Dr. Harris's characterization of mother "like a dog with a bone" who cannot refocus. Paul had demonstrated great growth and progress through his treatment, but "the reason that court would not return the little girls to mother, is that I can't believe she would not obsess over convincing them that they were wrong and it didn't happen, and this didn't happen in their family. She could not let it go. She would not let it go. I don't think she can let it go."

The court found conditions continued to exist which justified jurisdiction for all the children. The court asked Paul if he wanted to remain in a group home rather than return to mother without his sisters. His attorney said Paul wanted to be home with mother. The court placed him at home with mother, on condition that he remain in therapy.

The court found mother had received at least 18 months of reasonable services, recommended that the department change the social worker on the case, and terminated family reunification services as to the girls. A hearing was set pursuant to section 366.26. The court ordered continued counseling for the girls, but not conjoint counseling. It ordered home services, and monitored visits for the girls. It denied a last minute request for a sibling bonding study.

13

In her present petition, mother seeks review of the orders terminating reunification services and setting a permanency planning hearing under section 366.26. She asks that we vacate the court's orders as to the girls and order the return of E.P. or L.P. to her care. Alternatively, she seeks provision of additional reunification services, a bonding study between her and all three siblings, and conjoint counseling between the siblings to maintain their bond[3]. The department opposed the petition. Counsel for E.P. and L.P. also opposed the petition.

## DISCUSSION

### I

Mother argues that she and her children did not receive reasonable reunification services as required before a permanency planning hearing can be set under section 366.26.

"Family preservation is the priority when dependency proceedings commence. [Citation.] 'Reunification services implement "the law's strong preference for maintaining the family relationships if at all possible." [Citation.]' (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1787 (*Elizabeth R.*).)" (*Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1501 (*Earl L.*).) The plan for reunification services must be "'specifically tailored to fit the circumstances of each family [citation], and must be designed to eliminate those conditions which led to the juvenile court's jurisdictional finding. [Citation.]' [Citation.]" (*Ibid.*) "'The adequacy of the [social service agency's] efforts to provide suitable services is judged according to the circumstances of the particular case. [Citation.] '[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course

---

[3] Mother fails to support this request with reasoned arguments and citation to authority. We treat the point as waived. (*Rossberg v. Bank of America, N.A.* (2013) 219 Cal.App.4th 1481, 1502.)

of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . .' [Citation.]" (*Ibid.*)

"We review an order terminating reunification services to determine if it is supported by substantial evidence. [Citation.] In making this determination, we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders. [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citation.]" (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689 (*Kevin R.*).)

Mother argues that the sustained allegation that Paul sexually abused the twins was not adequately addressed by reunification services because conjoint counseling recommended at the T.D.M. in May 2013 was never implemented. The department argues the evidence establishes that neither mother nor the twins were ready for conjoint counseling. Counsel for the twins agrees that the department had offered, and given mother the opportunity to participate in, services tailored to the needs of the family. He points out that at the time of the contested hearing, the children had been detained for 27 months, well beyond the usual 18-month timeframe for provision of reunification services.

The evidence in this case establishes that mother had a severe conflict with social worker Wilkins, whose performance was lacking with respect to communicating with the professionals providing services to the family and in other ways. (We address mother's motion to remove him in the next part of the Discussion.) As we have recounted, the court found: "I think the services that were provided to the family were not the world's best services, for sure, but they were reasonable services." "'The standard is not whether the services were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' [Citation.]" (*Kevin R.*, *supra*, 191 Cal.App.4th at p. 692.) The record supports the court's conclusion that mother's obsessiveness and adamant refusal to consider the truth of the sexual abuse allegations

15

established a barrier to real progress in addressing the sexual abuse issue through reunification services. In addition, the evidence provided by Dr. Lippincott supports a conclusion that the twins had not progressed to the point that they could participate in conjoint therapy with Paul. Taking all these circumstances into account, we find substantial evidence that the family received reasonable services tailored to the case issues.

Based on her contention that reunification services were inadequate, mother argues the juvenile court erred in declining to extend services for an additional period. It is established that the court has discretion to do so; the issue is whether the court abused its discretion by not doing so.

Section 366.22, subdivision (a) provides that at the 18-month review, the court shall order a permanency planning hearing to be held under section 366.26 if the children are not returned to the parent.[4] (*Earl L.*, *supra*, 199 Cal.App.4th at pp. 1503–1504.) Where the juvenile court finds that the parent has not received reasonable reunification services, the court has discretion to extend the reunification period. (*Elizabeth R.*, *supra*, 35 Cal.App.4th 1796 [court has limited discretion to extend reunification period beyond 18 months for mentally ill mother hospitalized for all but 5 months of reunification period]; *In re Daniel G.* (1994) 25 Cal.App.4th 1205, 1213 [discretion to extend services where reunification plan not implemented for most of the reunification stage and services thus found not to be reasonable]; *In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777–1780 [discretion to extend services where reasonable services not provided because no reunification plan made for father].)

Here we have found substantial evidence to support the trial court's finding that the reunification services provided to mother and the children were reasonable under the

---

[4] Subdivision (b) of section 366.22 provides an exception to the termination of reunification services at the 18-month review hearing for parents who are making significant and consistent progress in a court-ordered residential substance abuse treatment program, or have recently been discharged from incarceration or institutionalization and are making significant and consistent progress in establishing a safe home for the child's return. These circumstances do not apply here.

circumstances. Since the children had been detained for 27 months, well beyond the normal 18-month cutoff for services, the denial of continued services did not constitute an abuse of discretion.

II

Mother contends that social worker Wilkins should have been removed from the case because he was biased. The record is replete with evidence of the conflict between mother and Wilkins. His supervisor, Hawkins, concluded that he acted inappropriately toward mother in at least one instance when he attempted to terminate a visit because mother was slightly late under excusable circumstances. Mother cites section 16513.5, which allows the juvenile court, upon request of a party, to remove a social worker from a dependency case if it finds a conflict of interest that would interfere with the social worker's ability to carry out his or her duties. Examples of qualifying conflicts include sexual contact with any party to the proceeding, a relationship with a prospective adoptive parent, or a conviction of perjury with regard to the pending dependency proceeding. Mother analogizes to a case addressing the conflict of interest arising in a criminal case charging a defendant with soliciting the murder of two deputy district attorneys assigned to the case. (*Millsap v. Superior Court* (1999) 70 Cal.App.4th 196.)

We need not look so far afield. In *In re Ashley M.* (2003) 114 Cal.App.4th 1, the issue on appeal was an order by the juvenile court that a particular social worker be assigned to a dependency matter. The Court of Appeal concluded that the juvenile court's order improperly invaded the executive functions of the county's social services agency in violation of the separation of powers clause of the California constitution. (Cal. Const., art. III, § 3.) (*Id*. at p. 6.) The court ruled that the assignment of a particular social worker was not a decision that fell within the "realm of the juvenile court's powers." (*Id*. at p. 8.) The court examined section 16513.5, and concluded "[n]othing in the statute gives the juvenile court authority to designate a particular social worker for a case." (*Id.* at p. 8, fn. 4.) It concluded: "The determination of how best to assign duties

17

to employees and otherwise allocate the agency's resources is not a judicial function and must be left to the agency's own discretion." (*Id*. at p. 9.)

Here, the juvenile court acted within its authority in recommending the assignment of a female social worker. It did not err in refusing to remove Wilkins.

In addition, issues of a social worker's bias and lack of objectivity are matters of credibility and are for the juvenile court to weigh and decide. "'It is the [juvenile] court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence. We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. [Citation.]' (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53.)" (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.) The Court of Appeal pointed out that the social worker's bias was vigorously explored by counsel during cross-examination. (*Ibid.*)

Here multiple witnesses including Wilkins, his supervisor, Hawkins, and mother, were examined thoroughly about each of mother's claims of bias. The juvenile court heard all the evidence and denied the motion to remove Wilkins. As in *In re Mickel O.*, *supra*, 197 Cal.App.4th 586, there was evidence apart from Wilkins's opinions that supported the court's decision to terminate reunification services, which we have discussed. Mother was given a full opportunity to present the bias issue.

The same analysis applies to mother's claim that Dr. Lippincott had a disqualifying conflict of interest, because the program for which she worked, UCLA Ties for Families, was oriented toward adoption rather than reunification of dependent children. Unable to find any authority directly on point, she analogizes to case law regarding a conflict of interest for minor's counsel.

Dr. Lippincott described UCLA Ties for Families as an outpatient mental health clinic that works with children and adolescents who are, or have been, in the foster care system providing them individual, family, and group therapy. The foster parents for the twins attended three classes of education about children in the foster care system, such as exposure to substances, trauma, and attachment. They contacted her agency about

18

therapy for the twins. When she started with the twins, they were in child/parent psychotherapy with the caregivers to help build attachment between them and the twins. Dr. Lippincott did two or three sessions with the foster parents and twins.

UCLA Ties for Families provides services to clients who have been in the foster care system. Either they have been adopted or they are in a current adoptive placement or they are in a regular placement. Clients did not have to be in adoptive placement. The majority of children Dr. Lippincott had seen at this program had been in adoptive placement. She was asked, "how many occasions, if ever, have you recommended that a child go back with the child's biological family?" She answered: "[w]e don't make recommendations surrounding that issue." She had not recommended a child participate in conjoint therapy with a biological parent while at UCLA, but did so in prior positions.

Dr. Lippincott supported her recommendation that the twins were not prepared for conjoint therapy with Paul about the sexual abuse issues with observations about the emotional reactions of the girls when that subject came up in therapy.

Mother failed to raise facts establishing a disqualifying conflict of interest. If anything, mother is attempting to establish a bias on the part of Dr. Lippincott toward adoption rather than reunification. Counsel for mother vigorously examined Dr. Lippincott on this subject at the contested hearing. The question of bias, which is an issue of credibility, is for the court to resolve. (*In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 615.)

### III

At the conclusion of the contested hearing, after the court set a hearing under section 366.26, counsel for mother requested a bonding study between all siblings. The court declined, saying: "There's too many balls in the air. I don't know how he's [Paul] going to do. If he's out of there, that's the end of that discussion." We review the court's order for abuse of discretion. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1341.) "The applicable standard of review is whether, under all the evidence viewed in a light most favorable to the juvenile court's action, the juvenile court could have reasonably refrained from ordering a bonding study. [Citation.]" (*Ibid.*)

19

"There is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to a termination order. . . . Family preservation ceases to be of overriding concern if a dependent child cannot be safely returned to parental custody and the juvenile court terminates reunification services. Then, the focus shifts from the parent's interest in reunification to the child's interest in permanency and stability. [Citation.]" (*In re Lorenzo C.*, *supra*, 54 Cal.App.4th at pp. 1339–1340.)

Mother contends that the request for a bonding study was made at the first available time, but does not explain why the need for such a study was not anticipated earlier in light of the issues between mother and the children. She contends that a bonding study would be relevant to issues regarding the parent-child and sibling exceptions to the preference for adoption under section 366.26, subdivisions (c)(1)(B)(i) and (c)(v).

While the court did not order a bonding study, it addressed monitored visits for the twins in the home after Paul's return to mother's care. The court wanted to see what was happening in the home. It declined to order the twins' visits to be in the home with wrap around and family preservation services as monitors because of uncertainty about how mother, Paul, and the twins would do with the new circumstances. But it did not foreclose such an order either.

There was testimony by those who monitored the family's visits that the twins enjoyed their visits with mother and with Paul, showing no fear or hesitation about him. It may well be that the court was satisfied that there was sufficient evidence relevant to the bond between the siblings, rendering a last minute bonding study, with further delay, unnecessary. We find no abuse of discretion in denial of the study.

## DISPOSITION

The petition for writ of mandate challenging the orders of September 20, 2013 is denied.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EPSTEIN, P. J.

We concur:


MANELLA, J.


EDMON, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.